**NAGER ELECTRIC COMPANY, Inc. and Keystone Engineering Corporation**

v.

**The UNITED STATES.**

**No. 348–64.**

United States Court of Claims.

May 14, 1971.

Edwin Efros, New York City, for plaintiffs; Albert Foreman, New York City, attorney of record. M. Carl Levine, Morgulas & Foreman, New York City, of counsel.

Ray Goddard, Washington, D. C., with whom was Asst. Atty. Gen. L. Patrick Gray, III, for defendant.

Before COWEN, Chief Judge, LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.

ON PLAINTIFFS' AND DEFENDANT'S MOTIONS FOR SUMMARY JUDGMENT ON PLAINTIFFS' SECOND AND THIRD CAUSES OF ACTION AND ON DEFENDANT'S COUNTERCLAIM

PER CURIAM.*

The basic facts and circumstances giving rise to this case are well known since on the lengthy road it has traveled to a merits determination after suit was instituted in this court by a petition filed on October 16, 1964, the case has been the subject of two Court of Claims decisions.[1]

I

*Preliminary Statement Outlining General Facts and Present Posture of Case*

In view of the above, the facts in the case will be restated in general terms only to the extent considered necessary for convenient reference in examining the matters now presented for review. It is sufficient to say at this point that the controversies between the parties arise out of a contract, No. AT(30–3)–260, entered into by plaintiffs (usually referred to in the administrative decisions under review here, and hereinafter sometimes referred to, as "Nager"), as joint venturers, and defendant, acting by and through the Atomic Energy Commission (hereinafter the "AEC" or the "Commission"), dated and executed October 16, 1956, for construction of a certain facility known and designated as "Second Phase Facility Construction, Project S3G," at the Knolls Atomic Power Laboratory near West Milton, New York. The initial total base contract price was $2,195,000; but by five certain amendments, this amount was increased.[2] A Notice to Proceed was issued to plaintiffs on October 30, 1956, the registered mail receipt therefor being signed on October 30, 1956. In due course, plaintiffs proceeded with contract performance and, thereafter, the disputes leading to this suit developed.

Plaintiffs' petition (original and amended) asserts three causes of action, and the defendant's answer (original and amended) asserts a counterclaim. Pur-

---

* This opinion is based on that of Trial Commissioner Franklin M. Stone. The court has made changes in Part II of the opinion and reaches a different result on plaintiffs' second cause of action. With respect to plaintiffs' third cause of action and the counterclaim, the court adopts, and incorporates herein, the trial commissioner's opinion, with only slight modifications.

1. See Nager Electric Co. v. United States, 368 F.2d 847, 177 Ct.Cl. 234 (1966), rejecting Government arguments that plaintiffs' first cause of action, based on allegedly improper partial termination-for-default, should be dismissed as barred by the statute of limitations; and 396 F.2d 977, 184 Ct.Cl. 390 (1968), holding that by its conduct in insisting throughout the prior administrative process that this claim was for a breach of contract, the defendant voluntarily waived the contractual requirement that it be handled under the "disputes" procedure and therefore was estopped from asserting the defense that plaintiffs failed to exhaust their administrative remedies, and also stating that plaintiffs' first cause of action should be dealt with as a breach claim not arising under the contract.

2. The initial decision of the AEC hearing examiner, issued September 26, 1963, mentioned hereinafter, and defendant's brief filed October 23, 1969, in opposition to plaintiffs' motion for summary judgment on their second and third causes of action, and in support of defendant's cross-motion for summary judgment, recite that by certain amendments the contract price was increased to $2,293,224.64. Said price is considered suspect and will have to be accurately established in other proceedings pending in this case for reasons explained hereinafter under Part IV of this opinion headed "Defendant's Counter claim," *infra*.

suant to the previous decisions of this court, particularly its 1968 decision (n. 1), plaintiffs' first cause of action, a breach of contract claim for improper partial termination and subsequent contract price reduction of $18,218, was severed for separate trial by order of the trial commissioner filed June 28, 1968, and said cause of action is not the direct subject of this opinion. The concern here is with plaintiffs' motion and defendant's cross-motion for summary judgment, and defendant's counterclaim, regarding plaintiffs' second and third causes of action, and a review, under Wunderlich Act [3] standards, of decisions made by the AEC with respect to two claims underlying said causes of action.[4]

In brief, plaintiffs' second cause of action arises from deductive Change Order No. 3, Addendum 4, issued April 12, 1957, which substituted a less expensive type and smaller number of emergency shutdown valves for those originally required by the contract specifications. Plaintiffs challenge the $170,796 Government credit for the deleted valves determined by the contracting officer and whose decision was sustained by the Commission below. Plaintiffs argue that no more than $45,168.35 (which would result in a net additional compensation to plaintiffs in the amount of $41,702.33), the price quoted for the original valves by the plaintiffs' sub-subcontractor supplier, or, as a maximum, $110,000, the amount contracted for with the first tier subcontractor for installation of the entire emergency shutdown valve system including the valves, should be deducted from the total contract price. The issue was included among those tried before an AEC hearing examiner who issued a decision on September 26, 1963. (See n. 4.) By Memorandum and Order issued December 18, 1963, the Commission denied both

the contracting officer's and the plaintiffs' petitions for review which relate to Change Order No. 3. Under regulations in effect at the time, a denial of a petition for review caused the AEC hearing examiner's decision to become the final action of the Commission, thus making it ripe for review here. 10 C.F. R. ¶ 2.762(e) (1963).

In their third cause of action, plaintiffs challenge the reasonability of the amount to be deducted from the contract price and credited to the Government for valve installation and hydrostatic pipe testing work deleted from the contract by deductive Change Order No. 18, Addendum 15 issued March 17, 1958. This issue also was tried before the AEC hearing examiner, this time with his decision of September 26, 1963, favoring the contractor. The contracting officer's petition for review of said decision was granted but in a decision issued April 23, 1964, the Commission reversed the hearing examiner, holding that it was reasonable and correct for the Government to deduct $10,258.02 for the work eliminated from the contract by Change Order No. 18. As it did below, the Government here urges that its actual cost of having the deleted work completed by another contractor ($10,258.-02) was a reasonable sum to pay for the work and, therefore, a reasonable amount to be deducted from the contract price. Plaintiffs argue that the work could have been done for no more than $2,000, which price therefore becomes an upper dollar limit on price deductions which may be reasonably taken. They further argue that the holding of the Commission is arbitrary, capricious, and not based on substantial evidence.

In both its answer and amended answer, defendant asserts a counterclaim for alleged overpayment by the Government to plaintiffs in the total amount of

---

3. 68 Stat. 81, 41 U.S.C. §§ 321–322 (1964).

4. See decision of the AEC hearing examiner, Samuel W. Jensch, dated September 26, 1963 (Adm.Rec. pp. 1122–1143);

AEC Memorandum and Order, dated December 18, 1963 (Adm.Rec. pp. 1202–1205); and decision of the AEC, dated April 23, 1964 (Adm.Rec. pp. 1233–1240), in AECBA No. CA–129.

$25,743.26. As a preliminary matter, it should be noted that the briefs to the trial commissioner indicated some confusion as to the degree to which the defendant's counterclaim is to be included in the decision on the parties' respective motions for summary judgment. Defendant's counterclaim alleges deductions due the Government for overpayment to the contractor by reason of (1) a claimed deduction in the amount of $170,796 relating to Change Order No. 3; (2) a claimed deduction in the amount of $10,258.02 relating to Change Order No. 18; (3) a claimed setoff in the amount of $18,218.80 for "Terminated Work"; and (4) a claimed setoff in the amount of $500 for "Snow Removal." In a word, the counterclaim challenges all of plaintiffs' three causes of action, since Change Orders 3 and 18 are the subject of plaintiffs' second and third causes of action, and the claimed setoff for terminated work relates to plaintiffs' first cause of action. The record does not readily disclose a connection between the claimed setoff for snow removal and any one of the three causes of action alleged by plaintiffs in their petition.

The June 28, 1968 order of the trial commissioner, mentioned hereinbefore, severing, for trial, plaintiffs' first cause of action from their second and third causes of action, stated in pertinent part:

> * * * It appears from plaintiffs' petition, defendant's answer and counterclaim, and plaintiffs' reply thereto, that the parties are properly in agreement that the action of the court with respect to plaintiff's second and third causes of action, and defendant's counterclaim, should be limited to a review of the administrative record of the proceedings before the United States Atomic Energy Commission's Board of Review (Commission) to determine whether the decision meets the standards prescribed by the Wunderlich Act, 41 U.S.C. §§ 321, 322.

Defendant argues that its "counterclaim for overpayment was not the sub-ject of any board or administrative proceeding and does involve disputes as to material facts. Accordingly, said counterclaim is not susceptible to the summary judgment procedure requiring an offer of proof on the part of defendant as to the accounting involved. Wherefore, defendant reserves the right to establish the proof of its counterclaim at such time as a trial is held on plaintiffs' first cause of action."

Plaintiffs counter that since Change Orders 3 and 18 are the subject of the summary judgment motions of the parties and are a part of defendant's counterclaim, they are in issue; that AEC hearings were conducted relative to these two change orders; and that, therefore, "it is indeed ludicrous for defendant to assert that the counterclaim is not susceptible to summary judgment procedure." Plaintiffs thus seem to argue that since a part of the counterclaim (Change Orders 3 and 18) is also the subject of the summary judgment motions, all parts of the counterclaim should be decided here.

Defendant argues the opposite approach—that no decision should be made on any part of the counterclaim, not even those parts of it which are also the subject of the summary judgment motion. By implication, the Government's theory must be that since part of its counterclaim cannot be presently decided, disposition of any part thereof must await the outcome of trial on the plaintiffs' first cause of action.

■ Neither extreme is demanded nor was either contemplated in the commissioner's June 28, 1968 order. The intent of the above-quoted language in said order was to indicate that a decision would be made on both motions for summary judgment and those parts of the counterclaim which were directly related thereto. No disposition was intended to be, or can be, made of the entire counterclaim since portions of it are related to the plaintiffs' first cause of action which is in dispute, is not the subject of the motions for summary judg-

ment, was not spoken to in prior administrative proceedings, and cannot be decided until after a determination on the merits before the commissioner. Instead, defendant's counterclaim will be decided herein only to the extent that it relates to plaintiffs' second and third causes of action. Disposition of the elements of the defendant's counterclaim not related to said causes of action must await the presentation of evidence on these other issues during the trial proceedings on plaintiffs' first cause of action.

## II

### Plaintiffs' Second Cause of Action

In their second cause of action, plaintiffs challenge the credit allegedly due the Government for the deletion from the contract of one type of emergency shutdown valves and the substitution of a different type. These valves serve the important function of preventing the escape of radioactive contamination in the event of a rupture or major incident in the reactor system.

As originally let, prior to the Change Order giving rise to the issue at hand, the contract provided in part:

"Valves are to be designed in accordance with all of the requirements listed in paragraphs M21–4.01 to 4.03."

"Valves shall be of the P–K Paul Series 4,000 design *or approved equal.*" [5] [Emphasis in original.]

Plaintiffs' successful bid was for the lump sum amount of $2,195,000. This sum was composed of bids obtained by Nager from subcontractors and suppliers. These suppliers might in turn obtain price quotations from another tier of businesses in fashioning their final quotations to Nager's prime con-

tractors. Such an interplay of parties is pertinent in determining the portion of the lump sum contract bid by plaintiffs which should be allocated to the emergency shutdown valves, and, therefore, credited to the Government as a result of the deletion of the valves from the contract under Change Order No. 3. By letter dated October 9, 1956, Cohn & Kramer, Inc., made an offer to Nager for all mechanical work, including emergency shutdown valve installation, for the sum of $870,000. By letter of the same date, Nager replied:

If we are the low successful Bidders, and are awarded the contract for the above Project, we will award to you, and you will accept, a subcontract in the amount of EIGHT HUNDRED SEVENTY THOUSAND DOLLARS (870,000), as per our letter of even date * * *.

Thus, when Nager did prove to be low bidder and was awarded the overall contract for the project, a contract was also created between Nager and Cohn & Kramer for the mechanical work involved in the project.

Almost concurrent with the letting of the contract, work on the emergency shutdown system was suspended by a letter dated October 30, 1956, sent to Nager by the contracting officer, which reads in pertinent part:

In accordance with paragraph GC–13 of the Specifications for Contract No. AT(30–3)–260, all work on the following items shall be *suspended* until January 1, 1957:

a. *Mechanical*

(1) Specification M–21—Emergency shutdown valve system—*Suspend* all work. [Emphasis supplied.]

5. In spite of the fact that the present case depends for its solution on an exact determination of what was originally required of the contractor in order that a determination may be made of the propriety of that which was later demanded, the full contract, including detailed specifications, was not forwarded by the contracting officer to the Commission. The original specifications in detail, therefore, are not, as are the detailed changes to them, a part of the administrative record. However, the parties agree as to the original contract's language in those sections pertinent to the dispute. Consequently, a decision based on the record as it now stands may be reached.

Much later, by letter dated April 12, 1957, the emergency shutdown valves on which work had been suspended (and the value of which is in question here) were deleted from the contract by Addendum No. 4 to Change Order No. 3.

After being awarded the prime contract with the Government, Nager requested Cohn & Kramer, Inc., to furnish plaintiffs with a cost breakdown of the $870,000 subcontract given to Cohn & Kramer. Cohn & Kramer sent the requested breakdown to Nager by letter dated December 3, 1956. Pertinent here, Item 21 thereof allocated $110,000 for installation of the "Emergency Shutdown Valve System." In turn, this cost breakdown was submitted by Nager to the Government for use in computing progress payments in accordance with the provisions of Section GC–09 of the contract which required contractor submission of progress charts.

To arrive at its bid to perform all mechanical work, Cohn & Kramer obtained bids from subcontractors for the project's components. Apparently relied on by Cohn & Kramer in arriving at a $110,000 figure for the installment of the original emergency shutdown valves, was a form quotation from Interstate Plumbing Supply Co., Inc. (Interstate), dated September 20, 1956, which states in part:

Estimate to Cohn & Kramer * * * Emergency section shut down valves M–21 * * * Paul valves series 4000 * * * FOR THE SUM OF $45,168.-35.

The following language was stamped at the bottom of the form:

*EFFECTIVE IMMEDIATELY*

ALL MATERIALS WILL BE INVOICED BY US AT PRICES PREVAILING AT TIME OF SHIPMENT

At some date subsequent to the issuance of Change Order No. 3, Interstate notified Cohn & Kramer that the price of the valves might increase above that quoted in September 1956. Thereafter, Cohn & Kramer notified Interstate that the particular valves on which the quote was made had been deleted from the prime contract. Interstate's reply, dated September 17, 1957, concluded as follows:

We wish to advise that we would, at that time, [September 1956] have accepted this order for the Paul valves, as per our estimate of September 20, 1956.

Within the same time frame, Fluid Controls, Inc. (Fluid Controls), the exclusive sales agent of P. K. Industries, Inc., the sole identified manufacturer of the Paul Series 4000 valves specified in the contract, released quotes for those valves. Prior to the bid opening, plaintiffs were notified (as were other contractors who might bid on the project) that the valves were priced at more than $200,000. By letter dated November 9, 1956, Cohn & Kramer was given a quote of $212,065 for the valves. No quotation was sent to, nor requested by, Interstate. The Sales Engineer for Fluid Controls gave unrebutted testimony to the effect that the specifically named valves could not be obtained from any other company at a lesser price and, since P–K was the only firm within his knowledge geared to produce the valves, they could be obtained from another manufacturer only at an enormous increase in price. Other than the approximately $45,000 price in the quotation from Interstate to Cohn & Kramer, the $212,065 quoted by Fluid Controls is the only specific price for the P–K Series 4000 valves which appears in the record.

Before the Commission (as here), plaintiffs primarily urged acceptance of the $45,168.35 figure as the amount which should be credited to the Government for the deletion of the valves by Change Order No. 3. Again, as it does here, the Government sought acceptance of the $212,065 figure. The AEC hearing examiner, by his decision of September 26, 1963 (which determination became the final action of the Commission per 10 C.F.R. ¶ 2.762(e) (1963)), found against the contractor on the the-

ory that (in broad terms) only the specifically-named Paul Series 4000 valves were meant to be the subject of Nager's bid; that the evidence presented indicated that the market value for the Paul Series 4000 valves was $212,065; and that this amount, therefore, is the figure which should be credited to the Government for the deletion of the valves by Addendum 4 to Change Order No. 3. For the reasons to be given, it is held that this administrative determination is incorrect and cannot be sustained.

■ At the outset, it is relevant to point out one error which may not be critical but should be noted. The hearing examiner concluded in his opinion that:

> * * * Since neither Nager nor its subcontractor submitted the name nor description of any other valves to the Contracting Officer for approval as an equal, the consideration in this proceeding is limited to the cost of only P–K valves. * * *

The basis for this conclusion is the contract specification which provided that "[v]alves shall be of the P–K Paul Series 4,000 design *or approved equal.*" (Being a determination based on contract interpretation, this particular administrative finding is one of law, and, hence, not binding on the court. 41 U.S. C. § 322.) The examiner's statement must be premised on a supposed duty on the part of the plaintiffs to come forward with the name of a company from which their subcontractor, Cohn & Kramer, with whom they had a contract to supply Paul Series 4000 valves or their approved equal, would have obtained the valves. The language of the contract makes difficult the finding of such a duty. As quoted above, before amendment by Change Order No. 3, the specifications required that Nager supply P–K Paul Series 4000 valves or an approved equal. General Provision Eight of the contract (Materials and Workmanship) further provides in part:

> * * * Where equipment, materials, or articles are referred to in the speci-

fications as "equal to" any particular standard, the Contracting Officer shall decide the question of equality. The Contractor shall furnish to the Contracting Officer for his approval the name of the manufacturer of machinery, mechanical and other equipment which he contemplates incorporating in the work, together with their performance capacities and other pertinent information. When required by the specifications, or when called for by the Contracting Officer, the Contractor shall furnish the Contracting Officer for approval full information concerning the materials or articles which he contemplates incorporating in the work. * * *

■ As the above provisions indicate, if plaintiffs were to use an item other than the specifically named Paul valves, at some point it would have become their duty to inform and submit pertinent information to the contracting officer concerning the proposed item in order that he might have an opportunity to decide whether the substitute might be adjudged an "approved equal" item. There is no indication in the record that plaintiffs did not stand ready to do exactly this. The requirement, however, may be reasonably read to exist only for so long as the particular item remains a part of the contract. When the requirement for a particular item or its approved equal is removed from the contract by change order, it obviously follows that the contractor no longer has an obligation to seek approval for an equal to the deleted item. In another context, as, for example, where the contract contained language requiring the contractor to submit proposals prior to bid award (*see* 41 C.F.R. § 1–1.307–6 & 7 (1971)), a contrary decision might be reached. However, on the present record there is no support for the proposition that the plaintiffs were under a duty to come forward and identify a specific type of emergency shutdown valve which would be equal to the type named in the contract before the time at which these valves were to be used. All that

the record reveals is that plaintiffs were contractually bound to supply, as part of their overall contract with the defendant, P–K Paul Series 4000 or approved equal valves. The very language implies that either the named valves, or, as an alternative, approved equal ones could be supplied. The deletion of the particular requirement (per Change Order No. 3), in effect, mooted the contractor's contractual obligation to supply either type. Thus, there is no viable basis for the administrative conclusion below that the amount to be credited to the Government as a result of Change Order No. 3 is necessarily limited exclusively to the market value of the P–K Series 4000 valves.

It is also pertinent to consider, in the beginning, whether at some date prior to the issuance of Change Order No. 3, plaintiffs were informed that the P–K Paul Series 4000 valves (or approved equal) were to be deleted from the contract. The hearing examiner made the specific finding that plaintiffs were informed both verbally and formally that the valves originally required by the contract were to be deleted. Regarding the first of these findings, the hearing examiner stated:

> Approximately a week after the contract was executed, the Contracting Officer verbally informed Nager that these Paul valves were going to be deleted from the requirements of the contract * * *.

The statement is made without citation to the record; defendant, similarly without citation, and with the exact language used by the hearing examiner, agrees with the quoted statement. Plaintiffs deny that the contracting officer verbally informed them that the Paul valves were to be deleted. Simply stated, there is no evidence in the record on which to base such a statement.[6] Without any basis in the record, the hearing examiner's finding of fact is not bottomed in

substantial evidence and must fail. 41 U.S.C. § 321.

▮▮ The hearing examiner additionally concluded that:

> * * * [O]n October 30, 1956, a formal and written notification to that effect [deleting the Paul valves from the contract] was sent to Nager. * * *

The document to which the hearing examiner referred is a letter from J. D. Anderson, the Project Manager to Nager, dated October 30, 1956, which reads in pertinent part:

> In accordance with paragraph GC–13 of the Specifications for Contract No. AT(30–3)–260, all work on the following items shall be *suspended* until January 1, 1957:
>
> a. *Mechanical*
>
> (1) Specification M–21—Emergency shutdown valve system—*Suspend* all work. [Emphasis supplied.]

Two additional mechanical items and one electrical item were also deleted. The hearing examiner's conclusion as to the effect of this letter is one of document interpretation, hence, one of law which is not binding on the court. 41 U.S.C. § 322. A plain reading of the document reveals no suggestion that any item required to be installed, including the emergency shutdown valves, was "deleted" from the contract. Nor is there other evidence in the record that irrespective of the document's plain language, it was intended to be, or in fact was, interpreted in a manner different than that indicated by its unambiguous language. There is no support for the proposition that the suspension of work on a portion of a contract finally and conclusively eliminates from the contract material items which make up that portion of the work so suspended. Thus, the declaration of the hearing examiner that the above-quoted letter of October 30, 1956, is a formal and written notification of

---

6. Defendant sees an admission to this effect in a colloquy in which plaintiffs' attorney participated, but we cannot find any such concession in that remark.

the deletion of the Paul valves is incorrect as a matter of law.[7]

The hearing examiner also rejected the plaintiffs' case as in any event contrary to law, stating:

> Nager's contention that it could procure the original valves for $45,168.35, and that the equitable adjustment for Change Order No. 3 should include a consideration of this estimate, is contrary to the authorities that measure a deduction, by reason of a reduction in material specifications, to the *reasonable market value* of these materials. * * * [Emphasis supplied.]

Further, in the eyes of the hearing examiner, the "reasonable market value" is a concept closely allied to "prevailing fair market value."

■■ The formula by which an equitable adjustment is to be computed is a determination of law, one therefore, decided independently by the court. N. Fiorito Co. v. United States, 416 F.2d 1284, 189 Ct.Cl. 215 (1969); Keco Industries v. United States, 364 F.2d 838, 176 Ct.Cl. 983 (1966), cert. denied, 386 U.S. 958, 87 S.Ct. 1027, 18 L.Ed.2d 105 (1967). The pertinent authorities compel rejection of the limited test applied in the administrative proceedings below. The measure for an equitable adjustment to the contract price resulting from a change order is, as was correctly indicated by the AEC hearing examiner, framed in terms of "reasonable cost." Bruce Constr. Corp. v. United States, 324 F.2d 516, 163 Ct.Cl. 97 (1963). The search for "reasonability," however, is not limited to inquiry of such factors as "fair market value" or "historical cost." *Id.*, 324 F.2d at 518, 163 Ct.Cl. at 101. In addition, the reasonable cost concept includes both "objective" and "subjective" elements, *Id.*, 324 F.2d at 518–519, 163 Ct.Cl. at 101.

■ The objective focus is on the costs that would have been incurred by a prudent businessman placed in a similar overall competitive situation. 324 F.2d at 518–519, 163 Ct.Cl. at 101. *See* Spector, Confusion in the Concept of the Equitable Adjustment in Government Contracts, 22 Fed.B.J. 5 (1962). As described earlier, the use of an objective approach (here, also limited to only the price of Paul Series 4000 valves) might lead one to the conclusion that the specific valves could be obtained only from P–K Industries at the quoted price of $212,065.

However, unless it also takes into account the subjective situation of the contractor, a test of "reasonable cost" is incomplete. This is to say that:

> * * * the standard of reasonable cost "must be viewed in the light of a *particular* contractor's costs * * *

7. It is perhaps unnecessary to point out, but is, in any event, striking, the extent to which this mistake of the Commission permeates the decision below. *See, e. g.,* that part of the hearing examiner's decision of September 26, 1963, at pp. 9, 10, which was sustained by the Commission. It requires, for example, that another finding of the hearing examiner —that the $110,000 progress payment figure was submitted with knowledge that the originally required valves were to be deleted—be overturned. The hearing examiner found that the progress payment schedule:

"* * * [W]as prepared in the light of the October 30 direction and change made to delete the $212,065 P–K valves, and to substitute other P–K valves of a lesser number, lesser expensive in design and lesser cost. The April 1957 change order merely formalized the stop work communication transmitted on October 30, 1956. * * *"

As demonstrated in the body of the instant opinion, the originally required valves were not "deleted" by the October 30, 1956 letter. Thus, the April 12, 1957 Change Order (No. 3) deleting the originally required valves could not "merely formalize" the content of that letter which only suspended work on the valves. Further, such a conclusion does not mesh with the hearing examiner's presumption that "Cohn & Kramer relied upon this figure and submitted a total of $870,000 to Nager for the mechanical work. * * *" And, the $870,000 bid from Cohn & Kramer to Nager was dated October 9, 1956, which obviously preceded even the October 30, 1956 suspension of work order.

[emphasis in original], and not the universal, objective determination of what the cost would have been to other contractors at large." [Bruce Constr. Co., *supra*, at 101, 324 F.2d at 518–519 quoting with favor from McBride, Confusion in the Concept of Equitable Adjustments in Government Contracts: A Reply, 22 Fed.B.J. 235 at 240 (1962).] [8] This consideration of the particular contractor's actual and probable costs is tied to the overall function meant to be served by equitable adjustments to contractors for Government-induced contract modifications:

> Equitable adjustments in this context are simply corrective measures utilized to keep a contractor whole when the Government modifies a contract. Since the purpose underlying such adjustments is to safeguard the contractor against increased costs engendered by the modification it appears patent that the measure of damages cannot be the value received by the Government, but must be more closely related to and contingent upon the altered position in which the contractor finds himself by reason of the modification. * * * [Bruce Constr. Co., *supra*, at 100, 324 F.2d at 518; McFerran v. United States, 39 Ct.Cl. 441 (1904).]

The equitable adjustment, in other words, should not increase the plaintiffs' loss nor decrease it at the expense of the Government. Keco Industries, *supra*; see S. N. Nielsen Co. v. United States, 141 Ct. Cl. 793 (1958); *see also* Nash and Cibinic, Federal Procurement Law (2d ed. 1969) at 564.

Another principle which is integrally involved in this case is that the Government has the burden of proving how much of a downward equitable adjustment in price should be made on account of the deletion of the original valves. Just as the contractor has that task when an upward adjustment is sought under the Changes clause, so the defendant has the laboring oar, and bears the risk of failure of proof, when a decrease is at issue.

It is in the light of the foregoing principles, that we consider the equitable adjustment to which the Government is entitled here. As we have said, Nager had a binding contract with its first-tier subcontractor, Cohn & Kramer, to install all mechanical work (including the valves) for $870,000. As described above, the record further reveals that, of the larger cost, $110,000 represented Cohn & Kramer's allocation of the contract amount for installing the emergency shutdown system (of which $45,168.35 is said by Nager to have been allocated as the cost of the valves). The defendant (which has the burden) has shown no adequate reason for challenging this Cohn & Kramer subcontract for $870,000, or for holding that the subcontract would not have been fully performed at that price if the original valve requirement had not been changed. So far as this record shows, Cohn & Kramer was a reputable firm, and it must be presumed that it would have honored its legally binding and valid obligation. We must act, therefore, as if this binding commitment directly to plaintiffs would have been carried out in due course, regardless of whether Cohn & Kramer would have had to pay more than it originally expected in order to obtain the Paul valves (or an approved equivalent).

Irrespective of whether the market price of the valves which were sub-

---

8. In the present case, of course, no "costs" were actually incurred since the type of valve originally required by the contract was deleted by Change Order No. 3, Addendum 4. The real issue is, then, a determination with as much certainty as possible, of the costs which would have been incurred had Change Order No. 3 deleting the valves not been issued. No reason is apparent, however, why this difference should change the analysis other than the practical likelihood that the presence of actual expended costs gives a reviewing tribunal a definite figure from which to begin analysis. Further, "historical costs" are presumably reasonable. Bruce Constr. Co., *supra*, 324 F.2d at 519, 163 Ct.Cl. at 101–102.

stituted is greater or less than those originally required, plaintiffs had struck a bargain with its subcontractor (Cohn & Kramer) to obtain the originally required valves, along with other work, for a stated figure. If, as may be the situation in the present case, that bargain was struck at a figure which did not take full account of the usual competitive price for the old valves, then to credit the Government with the higher market price when the valve item is deleted, deprives the contractor of the benefit of its bargain. And, by depriving the contractor of that benefit, the contractor is left in a less favorable position than if the contract had not been modified. Conversely, to credit the Government with less than the amount for which Nager could have obtained the valves (through Cohn & Kramer) would be to overcompensate Nager for its altered position resulting from Change Order No. 3. Thus, on the *particular* facts of the record at hand, to place Nager in a position which safeguards it "against increased costs engendered by the modification \* \* \*" (Bruce Constr. Co., *supra,* 324 F.2d at 518, 163 Ct.Cl. at 100), no more than the contract price properly allocable to the valves should be credited to the Government as a result of the deletion of the valves by Change Order No. 3, Addendum 4.

The question remains as to how much of the Cohn & Kramer subcontract for $870,000 is properly allocable, on this record, to the original valves. Nager argues, primarily, that the $45,168.35 figure, which the second-tier supplier (Interstate) quoted to Cohn & Kramer as the price of the valves, constitutes the proper sum, but in the alternative plaintiffs also argue, secondarily, for $110,-000, which was the amount Cohn & Kramer told plaintiffs that it allocated to the installation of the emergency shutdown valve system. We reject the former figure and accept the latter.

There are several interconnected grounds for refusing to adopt the $45,-168.35 sum. This was not a figure ever quoted by Cohn & Kramer to Nager, nor did the former ever commit itself to plaintiffs to supply the original valves for that amount.[9] The $45,000 figure was simply the sum quoted by the second-tier supplier, Interstate, to Cohn & Kramer to help the latter in calculating its subcontract bid to Nager. There is serious doubt, moreover, as to the firmness of Interstate's quotation, and whether that company was contractually bound to Cohn & Kramer at all—or, if so, in what amount. Interstate's form quotation (in September 1956) was labeled an "estimate", and it is very unclear whether it was a binding offer in any sense; Interstate's letter of a year later implies that there was in fact no actual contract at that time. Besides, stamped prominently on the quotation was the stark warning that "effective immediately all material will be invoiced by us at prices prevailing at time of shipment." Interstate did tell Cohn & Kramer, a year later after the original valves were deleted, that it would, in September 1956, "have accepted this order for the Paul valves, as per our estimate of September 30, 1956." But even this suspect *post litem motam* statement as to what would have happened the year before is quite ambiguous on its face since the original "estimate" of September 1956 contained, as an integral term, the caveat as to "prices prevailing at time of shipment." In addition, even if there were a binding commitment by Interstate (moral or legal), it is very uncertain that, when the time actually came, Interstate would in fact have supplied acceptable valves at the $45,000 figure—a sum about one-fifth of the cost of the Paul valves from the only manufacturer of them. In that circumstance Interstate might well have reneged. On the whole, we think this record compels us to reject the $45,000 figure as too flimsy and unsupported—as not in fact the amount Nager (through Cohn & Kramer) would

---

9. Nor is there any indication that the $45,168.35 figure was made known to the Government before the controversy arose.

probably have had to pay for the original valves if they had not been changed.[10]

On the other hand, there is solid support for the $110,000 figure. In December 1956, Cohn & Kramer gave Nager a breakdown of the $870,000 subcontract; that breakdown listed (as Item 21) the amount of $110,000 for installation of the "Emergency Shut-down Valve System" (including the valves in issue). This breakdown was shortly made known to the Government because it was then submitted by plaintiffs to the Government for use by the latter in calculating progress payments. It is therefore a pre-controversy figure of considerable substance which was revealed and acted upon before any dispute over the equitable adjustment. It may even be, in view of this breakdown supplied by the subcontractor (Cohn & Kramer), that the plaintiffs had not only a binding agreement with Cohn & Kramer to do all the mechanical work for $870,000, but also a subsidiary agreement to install the emergency shut-down valve system for no more than $110,000.

Plaintiffs intimate that there must be deducted from the $110,000 the cost of the labor of installing the valves, and also of whatever other items comprised the full emergency system. But there is no adequate showing as to these amounts, and in any event the subcontractor's commitment was not broken down as between the valves and the other components (including installation costs). On this record we think it more accurate, and more consistent with reality, to treat the $110,000 figure (about half of the "market price" of the Paul valves) as a unit representing what the deleted valves would have actually cost plaintiffs.

The sum of it is that defendant has very clearly not borne its burden of

showing that anything more than $110,-000 should be deducted from the contract price; and also that in our judgment $110,000, rather than $45,168.35 should be deducted.[11] Consequently, plaintiffs' motion for summary judgment on its second cause of action should be and is granted, to the extent that the figure of $110,000 is allocated to the valves deleted by Change Order No. 3. Defendant's cross-motion is denied to the extent that the Government is not entitled to a contract price reduction of $170,796 reflecting a valve price of $212,065, as found by the Commission below, but is granted to the extent that the contract price should be reduced by an amount reflecting a valve price of $110,000, rather than $45,168.35.

### III

*Plaintiffs' Third Cause of Action*

In their third cause of action, plaintiffs challenge the contract price reduction found reasonable by the AEC for work deleted from the contract and given to another contractor. Change Order 18, Addendum 15, issued March 17, 1958, deleted certain valve installation and hydrostatic testing work by revising the contract's drawings and specifications. The change was made under the authority of General Provision 3 ("Changes") of the contract, the Standard Form 23A contract clause, which provided in pertinent part:

> The Contracting Officer may at any time, by a written order, and without notice to the sureties, make changes in the drawings and/or specifications of this contract and within the general scope thereof. * * *

Another contractor working on the site, the A. J. Eckert Company, Inc.

---

10. Nager does not ask us to remand the case to the Commission to determine whether the $45,000 or the $110,000 figure should be accepted, and apparently expects us to make that decision for ourselves; accordingly, we do not stop to consider whether the Commission could make the other choice on the present record. The defendant cannot, of course,

complain that we select $110,000, instead of $45,000 as the amount of the decrease in price.

11. No figures are suggested by either party other than $212,065, $110,000, and $45,-168.35 (all of which we have considered and discussed *supra*).

(Eckert), performed the work deleted from the Nager contract under a change order to Eckert's own contract. Plaintiffs challenge the contracting officer's assessment to them of the costs of completing the work as being an illegal action on the part of the contracting officer, or, alternatively, argue that the Commission's figure for the deductions is not supported by substantial evidence, is arbitrary and capricious, and therefore fails according to the terms of the Wunderlich Act, 41 U.S.C. §§ 321, 322. The AEC hearing examiner, by his decision dated September 26, 1963, held that no deduction in the contract price should be taken for Change Order 18, Addendum 15. The contracting officer's motion for reconsideration of plaintiffs' Claim III was granted on December 18, 1963. The Commission, by its decision of April 23, 1964, reversed the contracting officer's holding, *inter alia,* that a contract price reduction of $10,258.02 was reasonable. It is from this series of decisions that plaintiffs' challenges arise.

■ Plaintiffs initially urge that the action of the AEC in eliminating work from the contract was illegal in two respects: (1) that the reasons for the elimination of the work were improper in the first instance, and (2) that giving the deleted work to another contractor for completion was also illegal. Administrative decisions on questions of law, of course, are not binding on this court. 41 U.S.C. § 322. As best it can be determined from plaintiffs' presentation they argue that if the work was to be eliminated, either the termination for convenience or termination for default clause of the contract should have been used. The apparent basis for this portion of plaintiffs' argument is twofold: First, it is based on conclusions drawn from the contracting officer's testimony to the effect that the plaintiffs failed to prosecute the work diligently, and, secondly, it is drawn from the wording of the "Changes" clause of the contract. Briefly referring to the testimony presented by the contracting officer, such testimony does indicate that he had some

fear that plaintiffs would not finish the work in timely fashion. The Commission found that, contrary to plaintiffs' assertions, the purpose served by this testimony was to counter arguments that the contracting officer was capricious and arbitrary in deleting the work from the contract. This interpretation is a reasonable one and neither the record as a whole nor the plaintiffs' arguments present cause to upset the Commission's conclusion. Secondly, plaintiffs urge that the standard "Changes" clause is an improper vehicle for work deletion, and that work thus deleted may not be given to another contractor for completion. Plaintiffs' theory is based on the wording of the clause and some of the language of General Contracting and Constr. Co. v. United States, 84 Ct.Cl. 570 (1937). That case does not apply to the facts at hand here. In *General Contracting,* a building was deleted from the contract under the apparent authority of the Changes clause thereof. In holding that the decision amounted to a breach of contract, this court said there (beginning with the sentence immediately following the excerpt quoted, and relied upon, by plaintiffs) that:

> * * * If he [the contracting officer] could eliminate one building from the contract under the guise of making changes in the drawings and specifications he could likewise eliminate two or any number of buildings and thus entirely change the contract. The elimination of Building No. 17 amounted to a cardinal change or alteration of the contract itself, a thing that could only be consummated with the consent of both parties to the contract. * * * (84 Ct.Cl. at 580)

■ In the instant case, there is no allegation, nor would the proposal of such a theory be successful, that the small amount of deleted work (in relation to the total contract) would represent a cardinal change. Further, work deletion under the authority of the Changes clause is not an unknown or illegal procedure. *See, e. g.,* cases cited in 2 Gov. Contracts Reporter ¶ 10,150.16

to 10,150.169; *cf.* The George Washington University, Changes and Changed Conditions (Government Contracts Monograph No. 3, 1962) at 8–9. Nor, as plaintiffs would imply, do factual situations always demand the exclusive use of either the termination for convenience or the changes clause to the exclusion of the other. J. W. Bateson Co. v. United States, 308 F.2d 510, 512–513 (5th Cir. 1962). *See* Appeal of Fred A. Arnold, ASBCA No. 7761, 1962 BCA ¶ 3508; *cf.* John Reiner and Co. v. United States, 325 F.2d 438, 163 Ct.Cl. 381 (1963), cert. denied, 377 U.S. 931, 84 S.Ct. 1332, 12 L.Ed.2d 295 (1964) (re Government discretion under termination clauses); *but cf.* Lovell v. United States, 59 Ct.Cl. 494 (1924) (non-standard changes clause).

It is thus apparent that the dispositive inquiry here is whether the price reduction of $10,258.02 found to be reasonable by the AEC is grounded in substantial evidence.

■ At the threshold, plaintiffs challenge the hearing examiner's refusal to admit into evidence Nager's Exhibit 13, representing plaintiffs' cost breakdown of their proposal to decrease the contract price by $2,000 as an equitable adjustment for the work deleted by Change Order 18. The Commission upheld the hearing examiner's action on the grounds that the document was based on hearsay and was not the product of the normal course of business, or, in the words of the hearing examiner, "there was a substantial void in the foundation as to Appellant's Exhibit 13." Plaintiffs argue that no such void existed and that the hearing examiner's refusal to admit the document prevented them from establishing that $2,000 was the reasonable amount by which to decrease the contract price for the work deleted by Change Order 18. Nager's primary witness, testifying at the hearing below as to the manner in which the estimate in question was compiled, was a Mr. Lavacek who, with two others, was the author of the final proposal document. The figures on which Nager's Exhibit 13 was based, however, came from information gathered by the other two individuals and the witness did not himself price any of the items. He further admitted that he simply assumed that the figures had been checked but that if this had not been done, or if there was a mistake in the figures, the document would contain errors. Without a better foundation, the value of this witness' statements clearly depend upon the veracity and competency of other persons, *i. e.*, those who actually performed the bulk of the work on the document. Given this set of circumstances and Nager's failure to present any adequate evidence as to the validity or correctness of the exhibit, the hearing examiner's refusal to accept the document into evidence was correct. *See, e. g.,* Clement v. Packer, 125 U.S. 309, 8 S.Ct. 907, 31 L.Ed. 721 (1888).

■ The plaintiffs' remaining, and most important, argument is that the $10,258.02 contract price reduction finding of the Commission for the work deleted by Change Order 18 is not supported by substantial evidence. Plaintiffs apparently do not challenge the general proposition that a decrease in the contract price is due the Government when the amount of work to be done by the contractor is decreased. *See* Appeal of Kennedy Elec. Co., ASBCA No. 3480, 56–2 BCA ¶ 1060 (1956). Rather, plaintiffs' first attack is directed to the fact that the amount alleged to be reasonable by the Government was initially $13,195.76 and thereafter decreased to the final $10,258.02 amount. Plaintiffs' argument is that "no explanation whatsoever was given as to the change," this lack of evidence apparently being proof positive of capricious Government action. An explanation, however, was readily available. In the proceedings below, the Government attorney candidly stated that the reason for the decrease in amount claimed was a deletion from the original estimate of the cost for items which the Government felt it could not prove. This statement was unrebutted and uncontradicted. Even if it were not, however, counsel for plaintiffs, both during the hearing and by letter, agreed that

$10,258.02 was the actual cost to the AEC to have the work deleted from the plaintiffs' contract completed by Eckert. While not conclusive, actual costs do carry the presumption of reasonability. Bruce Constr. Co., *supra*.

The Government also introduced other evidence during the hearing. This evidence, which the plaintiffs urge is insubstantial, was a series of time sheets and a daily log summary pertaining to Eckert's performance of the deleted work. The time sheets purported to show the names of the men who were working and the number of hours they worked on particular days. The daily logs purported to show the number of men working on Eckert's basic contract, and those performing the work deleted from the Nager contract and added to Eckert's basic contract by addendum. The evidentiary problem in the records, and the fact to which plaintiffs direct much of their attention, is the Government's admission that it could not conclusively connect the two sets of records because no records were kept during work performance which specifically related the two record compilations. Therefore, the Government admitted that it could not show, for a particular day, the identity of the specific persons who worked on the portion of the contract in question. There was evidence, however, that the records were prepared in the ordinary course of business in the manner normal for Eckert to keep such records. Further, several witnesses gave unrebutted testimony to the effect that the amount which the Government proposed to deduct from the contract (and which it had paid to have the work done) was reasonable. There was also uncontradicted evidence that Eckert prosecuted the work in a reasonable manner.

The Commission below found that while the time sheets and daily log summaries introduced by defendant were secondary evidence, they were the only back-up records as to costs available to defendant, and, as accepted summaries of the only records at defendant's disposal, fulfilled the requirements of the so-called "Best Evidence Rule," and thus were properly considered. The Commission's application of the relevant law was correct. United States v. Wood, 39 U.S. (14 Peters) 430, 10 L.Ed. 527 (1840); *see* Appeal of J. G. Watts Constr. Co., ASBCA Nos. 9448, 9458, 9459 and 9460, 1963 BCA ¶ 3966; Appeal of P. M. Painting Co., ASBCA No. 4954, 59–2 BCA ¶ 2420 (1959). Further, the underlying factual decision—that no records were available to the Government other than those presented, or made available to the defendant—was based on substantial evidence and is thus binding here. 41 U.S.C. § 321.

The overall determination of the Commission, therefore, was that $10,-258.02 was a reasonable deduction to make from the contract price for the work deleted by Change Order 18. Beginning with the stipulation of the parties that $10,258.02 was the work's actual cost, and throughout the presentation of other evidence described above, the record is replete with ample support for the Commission's conclusion. As a finding of reasonability is normally one of fact (United States v. Callahan Walker Co., 317 U.S. 56, 63 S.Ct. 113, 87 L.Ed. 49 (1942)), it is binding if, as here, substantial evidence supports that finding. Accordingly, the plaintiffs' motion for summary judgment on their third cause of action should be and is denied.[12] Conversely, defendant's cross-motion for

---

12. Plaintiffs make much of where the burden of proof should have been placed. The Commission carefully and clearly responded, rejecting plaintiffs' position. Briefly, the argument of plaintiffs is that the applicable statute placed the burden on the Government to prove the reasonability of the price deduction figures. The Commission disagreed but, in effect, found the plaintiffs' arguments mooted, stating:

"* * * even if it were to be held that the burden of proof on the issue of reasonableness of cost was on the contracting officer, we find that he amply sustained that burden by showing the actual cost together with such supporting evidence as was available, and by the opinion evidence

summary judgment regarding the plaintiffs' third cause of action, that $10,-258.02 is the reasonable figure to deduct from the contract price for the work deleted by Change Order No. 18, should be and is granted.

## IV

### *Defendant's Counterclaim*

Turning now to defendant's counterclaim referred to earlier in the preliminary statement appearing under Part I of this opinion, paragraph 38 of defendant's amended answer and counterclaim (filed August 9, 1967) alleges overpayment to plaintiffs of $25,743.26. Defendant's calculations leading to said amount are set forth below:

| | | |
|---|---|---|
| Original Contract Price | | $2,195,000.00 |
| Amendments: | | |
| No. 1 | $51,002.10 | |
| No. 2 | 14,517.19 | |
| No. 3 | 22,735.45 | |
| No. 4 | 15,567.83 | |
| No. 5 | 31,654.71 | |
| Contract Price as Amended | | 2,230,477.28 |
| Deductions: | | |
| Change Order No. 3 | 170,796.00 | |
| Change Order No. 18 | 10,258.02 | |
| Setoff for Terminated Work | 18,218.80 | |
| Setoff for Snow Removal | 500.00 | |
| Total | | 199,772.82 |
| Net Amount Due Contractor | | 2,130,704.46 |
| Paid to Contractor | | 2,156,447.72 |
| Overpayment | | 25,743.26 |

An analysis of the above calculation clearly shows that it is erroneous. For example, defendant states the original contract price to be $2,195,000, and after listing additive amounts relating to contract Amendments 1 to 5, inclusive, which total $135,477.28, shows the contract price, as amended, to be $2,230,477.-28. Obviously, the last stated amount contains a typographical error and undoubtedly defendant intended to state the amount to be $2,330,477.28, as alleged in

of several qualified witnesses whose testimony was not successfully impeached."
On the state of the record, this conclusion of the Commission was amply justified.

paragraph 33 of its original answer. However, as indicated in footnote 2, *supra*, the AEC hearing examiner found that the original contract price was increased by amendments to $2,293,224.64, but this amount is considered suspect. Although Amendment No. 5 to the contract,[13] considered alone, supports the last-stated amount, examination of Amendments Nos. 1 to 5, inclusive, together, and the pleadings of both parties, particularly comparing the figures used by defendant in the computation set forth in paragraph 33 of its original answer (counterclaim) with the figures in defendant's above-quoted computation, it appears that the amended contract price, as stated by the hearing examiner in his decision, is incorrect. While the record suggests that the contract price, as amended, possibly may have amounted to $2,330,477.80, this is not entirely clear from the record and cannot be found as a fact.

A determination, at this time, of the true contract price, as amended, is not essential to resolution of the matters presented for review here since the court is now concerned only with the amounts that properly and reasonably should be deducted from the amended contract price (whatever that amount may later prove to be), and credited to the Government as a result of the issuance of Change Orders Nos. 3 and 18, involving two items related to plaintiffs' second and third causes of action, respectively. However, the contract price, as amended, will be one of the matters requiring proof during the trial or other proceedings before the commissioner on plaintiffs' first cause of action.

For the reasons set forth hereinbefore under Parts II and III directed to plaintiffs' second and third causes of action, respectively, defendant's counterclaim, as it relates to Change Order No. 3, involving a claimed deduction item of $170,-796, is denied,[14] and the counterclaim, as

13. See Admin.Rec., p. 48.

14. To the extent, if any, that plaintiffs may have already received payment on

it relates to Change Order No. 18, involving a claimed deduction item of $10,-258.02, is allowed.

The other two deduction items in defendant's counterclaim, *i. e.*, the $18,-218.80 claimed as a setoff for terminated work, which relates to plaintiffs' first cause of action, and the $500 claimed as a setoff for snow removal, which does not appear to be related to any particular cause of action alleged by plaintiffs, were not considered in the administrative proceedings below, nor are they the subject of the present motions for summary judgment filed pursuant to the commissioner's order of June 28, 1968. Accordingly, decision on those two items will be made after the parties have had the opportunity to present their evidence before the commissioner.

### CONCLUSION

Therefore, plaintiffs' motion for summary judgment is granted as to their second cause of action, insofar as an amount of $110,000 is allocated as the reasonable price of the valves deleted by Change Order No. 3, and is otherwise denied; the motion is denied as to their third cause of action; defendant's cross-motion for summary judgment in the sum of $170,796 as to the plaintiffs' second cause of action, is denied in that amount, but is granted to the extent plaintiffs' motion on that cause of action is denied; defendant's cross-motion is granted as to that portion which relates to the plaintiffs' third cause of action in the amount of $10,258.02; defendant's counterclaim is denied as to Change Order No. 3, the subject matter of plaintiffs' second cause of action, in the sum of $170,796, but is granted to the extent, if any, that plaintiffs may already have been paid or credited more than they are entitled to under Part II of this opinion; and defendant's counterclaim is granted as to Change Order No. 18, the subject matter of plaintiffs' third cause of action, in the amount of $10,-

258.02. An appropriate determination as to the remaining portions of the defendant's counterclaim, which items were not the subject of the present motion or cross-motion for summary judgment, must be reserved and made in connection with trial or other proceedings before the trial commissioner on plaintiffs' first cause of action. Since the exact amounts of money respectively due and owed the parties cannot be determined pending completion of further proceedings in this case, actual entry of judgment implementing the holdings in this opinion will be held in abeyance until after the court finally resolves all remaining claims of the parties in controversy.

this change order of (or been credited with) an amount greater than that permitted by Part II of this opinion, *supra*,

defendant's counterclaim is, of course, allowed.