ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeal of - | ) |
| | ) |
| Derian, Inc. | ) ASBCA No. 62957 |
| | ) |
| Under Contract No. W912EF-19-C-0006 | ) |

APPEARANCE FOR THE APPELLANT:     Mr. Mark Jensen
                                                                        President

APPEARANCES FOR THE GOVERNMENT:     Michael P. Goodman, Esq.
                                                                        Engineer Chief Trial Attorney
                                                                     Theresa L. Hampson, Esq.
                                                                        Engineer Trial Attorney
                                                                        U.S. Army Engineer District, Walla Walla

OPINION BY ADMINISTRATIVE JUDGE TAYLOR

In this appeal, the government deleted certain contract work pursuant to a partial termination for convenience from a contract for the construction of oil water separator systems and the installation of new turbine pit sump pumps inside the powerhouse at the Lower Monumental Dam in Washington state. The contractor, Derian, Inc. (Derian or appellant), seeks to recover partial termination for convenience, delay, and constructive changes costs, and the reversal of the government's assessment of liquidated damages. The parties submitted the case under ASBCA Rule 11 and requested a ruling on entitlement and quantum. We sustain the appeal in part.

FINDINGS OF FACT

Contract Award and Requirements

1. On April 2, 2019, the United States Army Corps of Engineers (USACE or the government) awarded construction Contract No. W912EF-19-C-0006 (the contract) to Derian in the amount of $2,120,300 for the construction of oil water separator systems and the installation of new turbine pit sump pumps inside the powerhouse at Lower Monumental Dam in Washington state (R4, tab 3).

2. The contract included two Contract Line Items (CLINs) describing the work (R4, tab 3 at 28). CLIN 0001 required the supply and installation of new oil water

separators at a price of $909,450, while CLIN 0002 required the supply and installation of new turbine pit sump pumps at a price of $1,210,850 (*id.*).

3. Contract clause 52.211-10(c) required the contractor to complete "all on-site installation ... of the headcover pumps for Main Units 1-6 between June 2019 and December 2019" (R4, tab 3 at 34). No two units could be out of service at any one time unless allowed by the contracting officer (*id.*). The clause further stated, "Each unit must be completely operational, commissioned, and ready to be back on line prior to taking another unit out of service" (*id.*). The clause also required that all on-site installation work for the main units headcover pumps be completed by December 20, 2019, with complete system commissioning to be completed by January 19, 2020 – 30 days after the final installation date (*id.*). The parties agreed the original contract completion date was January 19, 2020 (R4, tab 7a at 1342).

4. The contract incorporated by reference Federal Acquisition Regulation (FAR) 52.249-2, ALT I, "TERMINATION FOR THE CONVENIENCE OF THE GOVERNMENT (FIXED PRICE) (APR 2012) – ALTERNATIVE I (SEP 1996)" (R4, tab 3 at 32).

5. The contract also contained FAR 52.211-12, LIQUIDATED DAMAGES-CONSTRUCTION (SEP 2000). That clause, in part, states:

> 52.211-12 LIQUIDATED DAMAGES--
> CONSTRUCTION (SEP 2000)
>
> (a) If the Contractor fails to complete the work within the time specified in the contract, the Contractor shall pay liquidated damages to the Government in the amount of $1,335.00/day for each calendar day of delay until the work is completed or accepted.

(R4, tab 3 at 35)

6. Contract Section 01 45 04.00 28, paragraph 3.10 states the contracting officer will notify the contractor of any detected noncompliance with the quality requirements (R4, tab 3 at 218). After receipt of such notice, this section required Derian to immediately take corrective action (*id.*). If Derian failed or refused to promptly comply, the contracting officer could issue "an order suspending or stopping all or part of the work" until Derian took satisfactory corrective action (*id.*).

7. The contract required Derian to submit a quality control plan (R4, tab 3 at 211). Derian's "Quality Control Plan" listed eight "Definable Features of Work" (DFOWs) (R4, tab 6a at 1282-83). Derian's list of DFOWs was derived from the contract's

2

technical specifications and were intended to "help facilitate scheduling preparatory meetings" before beginning each activity (R4, tab 6a at 1282). The DFOW list included "Division 26 – Electrical" and "Division 35 – Waterway and Marine Construction," which included the pump work (R4, tab 6a at 1283).

8. The contract also required Derian submit to the contracting officer for approval separate Activity Hazard Analysis (AHA) reports at least 15 working days prior to beginning "each activity, task or Definable Feature Of Work involving a type of work presenting hazards not experienced in previous project operations, or where a new work crew or subcontractor is to perform the work" (R4, tab 3 at 165).

9. Also, prior to beginning work on each DFOW, the contract required Derian to hold a preparatory meeting and conduct certain preparatory activities, including reviewing the minutes of the preparatory meeting (R4, tab 3 at 213-14). Likewise, Derian's quality control plan indicated preparatory meetings would be held before beginning work on each DFOW, and the results of those meetings would be documented in separate minutes (R4, tab 6a at 1278).

10. The contract required the contractor to conform to the contract drawings (R4, tab 3 at 39). The contract drawings showed the contract required monolithic pump plates (R4, tab 3 at 394-95). The drawings also required the contractor to field verify the steel pump plate dimensions prior to cutting and fabrication of the steel plates (R4, tab 3 at 392, 394-95).

11. On April 9, 2019, the government issued Derian a notice to proceed with the contract (R4, tab 3e at 501). The notice informed Derian that only a warranted contracting officer had the authority to modify or change the contract's terms and conditions (*id*).

Contract Performance

12. On May 15, 2019, Derian and the government held a pre-work meeting at Lower Monumental Dam (R4, tab 4a). During that meeting, the government again informed Derian that only the contracting officer could make changes to the contract (R4, tab 4a at 507). Similarly, the government informed Derian, at the pre-construction meeting on June 24, 2019, that the Administrative Contracting Officer (ACO) had the contract authority throughout the project, and Mr. Timothy Kuhlman, the government's quality assurance representative, had no such authority (R4, tab 7b at 1344).

13. Following the pre-work meeting and site visit, Derian informed the government that the pump foundation plates may need to be modified due to various conflicts with existing electrical outlets, cabling, and piping (R4, tab 4x at 946). Mr. Kuhlman recalled telling Derian in response to their notification regarding the pump foundation

3

plates that "the potential solution of using split plates would be easier to install in the field than a single plate, a split plate appeared to be acceptable, and that an RFI would need to be submitted to confirm acceptability" (*id.* at 947). The government accepted the split plate modification (*id* at 948).

14. On July 11, 2019, Derian submitted an AHA for the activity/work task described as "Pump Install (Electrical)" to the government (app. supp. R4, tab 1 at 1-3). The AHA did not identify a DFOW (*id.*). On July 17, 2019, the government accepted the AHA for the electrical work inside the main unit number four (MU4) with comments (R4, tab 4u at 935). The comments included the direction to "[R]esubmit revised AHA when definable features of work are added" (*id.*). The record does not indicate Derian resubmitted the AHA for the electrical work.

15. Derian's quality control report noted that as of July 22, 2019, the parties had not held a preparatory inspection meeting for the electrical work (R4, tab 6d at 1335). The preparatory meeting for the electrical work was subsequently held on August 12, 2019 (R4, tab 4u at 936).

16. On July 23, 2019, Derian's pump inspector/technician and electrical subcontractor personnel were inside the MU4 enclosure performing electrical "preparatory activities" (R4, tab 5b at 962). That same day a dam-wide power outage occurred (R4, tab 4b at 519). The power outage lasted approximately two hours (gov't br. at 12; app. supp. R4, tab 12 at 47; app. supp. R4 tab 13 at 48). The government determined an open knife switch in the vicinity where Derian's electrical subcontractor was working caused the outage, but the responsible party could not be conclusively determined (R4, tab 4u at 938; app. supp. R4, tab 12 at 46-47).

17. In an email dated July 23, 2019, Mr. Glenn Matlock, the USACE ACO, asked Mr. Alexzander Newcomb, the USACE project manager, whether the government should shut Derian down due to the power outage (app. supp. R4, tab 76 at 215). Mr. Newcomb responded, "[T]hey are currently on a quasi-safety shutdown while the project and Dave Kotas conduct an investigation to see what caused the outage" (*id.*).

18. On July 24, 2019, the USACE ACO notified Derian that the government was concerned with various quality deficiencies in Derian's quality control and directed Derian to stop "all further installation of the head cover pumps and corresponding electrical work" (R4, tab 4b at 520). The ACO noted various deficiencies, including deficient pump foundation plates, failure to conduct required preparatory meetings, and failure to provide the necessary oversight to its electrical subcontractor (*id.* at 519-20). The ACO also directed Derian to submit a revised quality control plan and a written recovery plan since they were behind schedule due to numerous "non excusable delays" (*id.* at 520). The ACO cited contract section 01 45 04.00 28, paragraph 3.10 as the authority to issue the stop work directive until the deficient

4

processes were corrected (*id*.). The stop work directive did not mention the power outage. We find the government issued the stop-work directive due to its concerns with various Derian quality deficiencies, and not the power failure, even if the power outage brought Derian's deficiencies to the government's attention.

19. On July 25, 2019, Derian responded to the ACO's quality control and schedule concerns (R4, tab 5a at 954-60). Derian indicated it had submitted an "RFI" with corrective actions for review and approval on the pump foundation plates, reaffirmed preparatory meetings would be held for all DFOW new work, and that the government knew its subcontractor was performing preparatory onsite electrical work on Turbine number four on July 22 and 23 (*id*. at 954).

20. On July 31, 2019, Mr. Kuhlman emailed Mr. Don Sayre, Derian's quality control systems manager, including pictures of the "Little Goose" dam turbine. In the email, Mr. Kuhlman stated, "[T]his is the quality we will be looking for and Derian needs to strive for." (R4, tab 6d at 1337).

21. On August 6, 2019, Mr. Kuhlman and Mr. Neil Voit, Derian's project manager, toured the MU 4 Turbine area (app. supp. R4, tab 83 at 443). Derian's "Quality Control Document (QCR) Daily Log Of Construction" documented certain "Verbal Instructions given by Government" (*id*.) The QCR Daily Log stated:

> Discussions between Derian and the QAR compared photographs of work in Unit 4 turbine pit to photographs of the same work in a turbine pit at Little Goose. According to the QAR, if our mechanical and pipe support installations look like those in photographs from Little Goose, "You're good." Derian agreed to imitate the photographs or provide acceptable, equivalent alternatives.

*Id*.

22. On August 8, 2019, Mr. Voit emailed Mr. Newcomb addressing the government's concerns that resulted in the stop work directive (R4, tab 7c at 1348-49). In that email, Mr. Voit acknowledged Derian's "current quality control program is not acceptable" (*id*. at 1348). With regards to the government's concern with the piping installation, Mr. Voit noted Derian had:

> coordinated with Tim onsite in order to develop a mechanical system that matches the standard set for the Little Goose installation. There are minor material and pipe support variations that have been discussed and agreed upon with Tim as acceptable. We believe that we

5

> have established confidence in our mechanical approach
> with Tim in order to meet USACE expectations.

*Id*. Mr. Newcomb forwarded that email to the ACO on August 8, 2019 (app. supp. R4, tab 10 at 39).

23. The government authorized Derian's return to work on Unit 4 on August 12, 2019, following the government's acceptance of Derian's written recovery plan (R4, tab 4c at 521).

24. On September 5, 2019, the government confirmed Derian had satisfactorily installed new head cover pumps in Unit 4 and that the pumps worked well with the unit on standby. The government noted, however, that the new pumps could not keep up with the water inflow when the pumps were turned on. (App. supp. R4, tab 15 at 51)

25. The government determined it needed a design solution involving the installation of Variable Frequency Drives (VFDs) to allow the pumps to keep up with the water inflow (app. supp. R4, tab 9 at 37). The government further decided it needed to issue a modification to the contract to install the VFDs (*id*.). The government noted it would have to limit Derian's schedule on the contract until the new VFD design was completed (app. supp. R4, tab 9 at 36).

26. On September 13, 2019, the ACO informed Derian that the government was working on some solutions to the leakage problem that would require a contract modification (app. supp. R4, tab 60 at 148). The ACO further notified Derian to limit its activities to placing pump plates and installing header pipes and suction pipes unless they heard otherwise from himself or his staff (*id*.). The government indicated it could be 2-3 weeks before a technical solution was finalized (*id*.). Derian informed the government that this development would prevent it from proceeding as scheduled on Unit 6 and impact its approved schedule (*id*.).

27. On November 26, 2019, the parties signed Modification No. A00002, that required Derian to install VFDs for the headcover pumps to address the leakage issue (R4, tab 3b). The modification increased the contract price by $131,438.40 to $2,254,644.71 (*id*. at 493). The modification further stated the contract completion date remained unchanged but:

> The Contractor is entitled to additional time related to this
> modification. As agreed by both the Government and the

6

Contractor, the time impact will be negotiated and settled through a future modification.

(*Id*. at 494)

28.  The modification also included a "Closing Statement" that said:

> By signing this supplemental agreement, Derian, Inc., hereby releases the Government from costs (excluding time impact) associated with future equitable adjustments and cumulative impact and inefficiency claims attributable to Modification A00002.

(R4, tab 3b at 494)

Contract Partial Termination

29.  On December 12, 2019, the government determined it could complete the pump installation in the turbine pits on its own (app. supp. R4, tab 14).

30.  On December 19, 2019, the USACE Project Manager, Mr. Kurt Monger, signed a "Project Change Request Form" to "De-scope portions of the work inside the turbine pits from the current contract" (app. supp. R4, tab 85 at 450).  In Part A, the form stated:

> The contract stated that the contractor had certain dates that the Units would be available to perform the work.  The contractor was provided these Units during the Contract stated dates, but the Contractor was not able to complete the required work during the outage timeframe.  Unit 4 was not completed due to a differing site condition of excess leakage in the Unit.  Some of these changes were government caused delays.  These Units will not be available again until after the Contract Completion Date.  Some Units that were missed may not be available until next year.
>
> The PDT [Project Delivery Team] determined that the best approach was to do a partial Termination for Convenience and modify the current contract to de-scope the remaining work in the Turbine Pits, having the Contractor complete the remaining work outside the Turbine Pits.  The remaining work inside the Turbine Pits will be completed

7

by the Project Personnel at Lower Monumental Dam.  The
Contractor will turn over all materials and supplies to
complete the work in the Turbine Pits.  The Contractor will
still be required to complete placement of the Oil Water
Separator Tanks and installation of the Header Piping
under this contract.

This is the recommendation of the PDT that included
concurrence during meetings with Lower Monumental's
OPM, The Resident Engineer and the Contracting Officer.

(App. supp. R4, tab 85 at 454)

31.  The "Project Change Request Form" also indicated a revised physically complete
date from January 31, 2020 to September 31, 2020, (*id.* at 454-55).

32.  The government's change control board met the same day and approved the
recommendation to partially terminate the work inside the turbines (app. supp. R4,
tab 69 at 183-84).  The government decided not to inform Derian until they could
complete a "very clear and detailed scope of work" describing the work the
government wanted Derian to complete (*id.* at 184).

33.  By letter dated January 13, 2020, the ACO requested Derian submit a plan and
schedule by January 16, 2020, as to how they intended to complete all the remaining
work associated with the oil water separator system (R4, tab 4d at 523).

34.  On January 16, 2020, Derian responded to the ACO's January 13, 2020, letter
regarding scheduling concerns.  Derian pointed out the January 19, 2020, completion
date was based on note 3 within contract section 52.211-10, which stated, "[T]he
Contractor shall complete system commissioning within 30 days of final installation."
Derian maintained it had not yet been allowed to complete any "Main Unit"
installations due to USACE's schedule limitations resulting from the leakage problem.
Nevertheless, Derian indicated it would install the mechanical and electrical systems
that week to prepare for oil water separator (OWS) commissioning. (R4, tab 5d at 971-
72).

35.  On January 17, 2020, the government issued Derian a notice of partial termination
for convenience under FAR 52.249-2, ALT I, TERMINATION FOR
CONVENIENCE OF THE GOVERNMENT (FIXED-PRICE) (APR 2012) (R4,
tab 4e).  The terminated work included connecting the turbine pit discharge piping to
the OWS intake header on four of the six units; installation of copper tubing and sight
glasses on OWS tanks; completion of preoperational tests, in service tests and
commissioning for the OWS system; demolition of existing electrical work for five

8

units; demolition of existing pumps and piping in four units; installation of pumps and piping in two units; installation of piping for three units; installation of the VFDs for all six units; and completion of the commissioning for all six units (*id.* at 524).

36. On January 24, 2020, the USACE notified Derian that the contract completion date of January 19, 2020, for the unterminated work had passed and "not all the work associated with the oil-water separators, as-builts, O&M manuals, etc. are complete" (R4, tab 4f at 529). The government further indicated it might withhold funds from future payments in anticipation of the assessment of liquidated damages (*id*. at 530). The government also informed Derian that it could submit a request for equitable adjustment if it felt it needed an extension of time (*id*.).

37. On February 3, 2020, Derian responded to the government's January 24, 2020, notification. In its response, Derian disputed the January 19, 2020, contract completion date. Derian asserted it had not been given the opportunity to complete the final unit installation due to the government's design delay. Derian also indicated it had "completed all the required field mechanical and electrical work in anticipation of beginning startup, testing, and commissioning of the OWS system on January 21, 2020." Finally, Derian indicated it did not need to request a time extension since it had complied with the contract. (R4, tab 5e at 1034)

38. On February 27, 2020, the parties entered into Modification No. A00003 (R4, tab 3c). That modification set the contract amount at $2,250,044.71 (*id*. at 496).

39. By letter dated March 4, 2020, the USACE notified Derian that its construction progress was sufficiently complete to allow the government use and possession of the facility effective February 20, 2020 (R4, tab 4g at 532). The government further notified Derian that "potential liquidated damage withholdings" ceased effective February 20, 2020 (*id*.). In the final decision, the government noted the February 20, 2020, date was 32 days past the original contract completion date (R4, tab 2 at 13).

40. By letter dated April 2, 2020, the USACE provided Derian with revised marked-up technical specifications "to reflect the clarifications and correspondence between the Government and Derian" on the terminated work since the initial notice of partial termination for convenience (R4, tab 4h at 541). On May 12, 2020, the USACE provided Derian with the "final marked-up technical specifications" showing the terminated work (R4, tab 4i at 571).

Derian's Claims

41. On May 29, 2020, Derian submitted a "Final Cost Settlement" document in response to the partial termination for convenience notice (R4, tab 5h). In that document, Derian (1) discussed 11 USACE actions and changes that it alleged resulted

9

in additional costs and delays; (2) listed subcontract termination costs in the amount of $7,881 and its termination settlement costs associated with the termination inventory and turnover process of $7,030; and (3) included four contract credits totaling $64,370 resulting from the terminated work (*id* at 1042-45). Derian requested a $61,935 adjustment to the contract price, increasing it from $2,250,044.71 to $2,311,979.71 (*id.* at 1045).

42. On June 17, 2020, the government informed Derian its proposed additional costs resulting from alleged changes and delays in its "Final Cost Settlement" should instead be submitted as a request for equitable adjustment (REA) (R4, tab 4k).

43. On July 16, 2020, Derian submitted another letter entitled "Request for Equitable Adjustment" (R4, tab 5i). Derian again listed the 11 USACE actions it alleged created contract changes and delays resulting in increased costs (*id*. at 1262-64). Derian, however, did not list its termination costs or credits for the terminated work in this document. Derian requested a contract price adjustment in the amount of $111,394 for these additional costs (R4, tab 5i at 1264).

44. The government responded to each of Derian's 11 "additional costs" requests under separate correspondence from August 28, 2020, through February 19, 2021 (R4, tabs 4l - 4y).

45. On February 25, 2021, Derian submitted a certified claim indicating settlement negotiations had reached an impasse and referenced its May 29, 2020, and July 16, 2020, letters and an attached "REA & Termination Settlement Summary" (R4, tab 1).[1] Derian asserted a request for an equitable adjustment and claim for "termination settlement costs" (*id*. at 3). Derian also disputed the government's liquidated damages assessment (*id*.). Derian claimed the current contract amount should be revised from $2,250,044.71 to $2,259,019.41, resulting in a final payment due Derian of $372,835.55 (*id*.).

46. On May 13, 2021, the government issued unilateral Modification No. A00004 increasing the contract price from $2,250,044.71 to $2,263,279.71 resulting from the government's determination that Derian was entitled to additional costs in the amount of $1,023 for the OWS Relocation, $1,860 for the pump plate modification, and $10,352 for the supplemental pumping claims (R4, tab 3d).

---

[1] Neither party included the referenced attached "REA & Termination Settlement Summary" in the record.

Government's Final Decision

47. On June 8, 2021, the government issued a final decision in response to Derian's claim (R4, tab 2). In its final decision, the government addressed each of Derian's 11 additional cost claims, Derian's claimed termination for convenience costs, and Derian's request for remission of the liquidated damages (*id*.). The government characterized Derian's claim as "a change to the contract price in the amount of $111,394, an extension of time equal to fifteen (15) calendar days, a proposed termination cost credit of $102,409.30, and the remission of liquidated damages in the amount of $42,720.00" (*id*. at 4). The final decision also noted Derian claimed an entitlement to the remaining contract balance of $372,835.55 (*id*.).

48. The final decision found merit or partial merit in four of Derian's 11 additional cost claims and awarded Derian an additional $26,391 in costs (*id*. at 14). The government agreed to pay Derian additional labor costs in the amount of $1,860 to adjust the pump plates to deal with the existing electrical outlets and cabling (id. at 10). The government noted it had issued Modification No. A00004 reflecting the increased costs from three of Derian's claims in the amount of $13,235 and intended to issue a separate modification for the "foot valves" claim in the amount of $13,156 (*id*. at 10-11). The record does not indicate the government ever processed the modification for the "foot valves" claim.

49. The final decision also determined the government's credit for the terminated work was $186,985 (*id*. at 12). The final decision determined this amount based upon an analysis of the terminated work prepared by its cost engineers and construction personnel (*id*. at 11; R4, tab 8a at 1393-1413). The USACE engineers calculated the government's contract cost estimate for the deleted work using information from Derian's proposals when the information was "determined to be sufficiently documented and acceptable" and "cost estimating tools, methods, labor rates and indexes normally used in evaluating termination cost claims" (R4, tab 8a at 1369, Schmode declaration). The USACE engineers did not rely upon or have any knowledge of Derian's contract pricing (*id.* at 1394). The government's estimate further indicated it used the Davis Bacon labor rates for Franklin County, Washington, and material prices from quotes, supply catalogs, previous estimates, and the 2016 MCACES RSMeans Unit Price Book (*id*. at 1401). The estimate also included a 2.54% escalation factor from the mid-point of the construction period and applied a 27% overhead rate and a 5.95% profit from the weighted guidelines (*id*. at 1401-02).

50. Derian, on the other hand, apparently calculated the value of the terminated work based on the original approved rates set out in its bid documents, along with approved

11

profit and overhead rates applied throughout the project (app. br. at 2). Derian, however, provided no supporting documentation for its calculations.[2]

51. The below table summarizes the government's and Derian's calculations for the contract's deleted work:

| | Gov't | Derian |
|---|---|---|
| CLIN ITEM 0001 Supply And Install New Oil Water Separators | 49,113.00 | 24,044.40 |
|    Install Parts | 416.00 | 0 |
|    Commissioning and Training | 19,731.00 | 4,292.95 |
|    Curtain | 11,713.00 | 9,016.52 |
|    Sump Pump Drain to CRES Header | 17,253.00 | 10,734.93 |
| CLIN ITEM 0002 Supply And Install New Turbine Pit Sump Pumps | 81,906.56 | 22,407.99 |
|    Equipment Nameplate Installation | 828.00 | 1,085.08 |
| Termination Costs for Inventory/ Turnover of Materials | | |
|    General Contractor – Labor Report | (7,279.52) | (7,030.14) |
|    CREM – 25 Hours | (3,708.92) | (7,880.84) |
|    Termination Costs - Negotiations | | (20,165.01) |
| Remove Existing Pumps and Piping | 24,043.00 | 6,636.67 |
|    Remove and Salvage Pumps | 13,318.00 | 5,804.75 |
|    Remove and Salvage Flexible Pipe | 4,162.00 | 831.92 |
|    Remove Electrical | 6,563.00 | 0 |
| Install New Turbine Pit Sump Pumps | 68,024.00 | 49,762.23 |
|    Install Parts | 33,296.00 | 24,450.50 |
|    Electrical | 11,605.00 | 12,865.78 |
|    Commissioning Pumps in Turbine Pits | 23,123.00 | 12,445.95 |
| ITEM 0004 Install Headcover VFDS | 55,966.00 | 55,966.00 |
| TOTAL | 186,985.56 | 102,418.39 |

(R4, tab 8a at 1405-1413; App. br. at 18)

52. Finally, the final decision reasserted the government's claim for liquidated damages in the amount of $42,720 for 32 days at the contractual rate of $1,335 per day

---

[2] In its brief, Derian also contends it should be reimbursed for its actual incurred costs on the terminated work under a termination for convenience (app. br. at 13). Derian did not, however, provide any actual incurred cost data for the deleted work.

(*id*. at 13).  The final decision determined a contract completion date of January 19, 2020, and an actual completion date of February 20, 2020 (*id*.).

53.  On June 15, 2021, Derian appealed the government's final decision to the Board.

Derian's Complaint

54.  In its complaint, Derian reasserted its claim for four of the eleven increased cost claims, including one on which the contracting officer awarded a partial amount (compl. at 1-2).[3]  The four remaining increased cost claims include delays and increased costs for (1) its subcontractor Columbia River Electrical Maintenance (CREM) in the amount of $13,362 due to the work stoppage resulting from the power outage; (2) Derian's and its vendor's increased costs in the amount of $15,745 resulting from the government's alleged failure to grant a safe clearance and the delay due to the loss of power; (3) increased costs in the amount of $27,327 due to the alleged changed contract requirement to provide different stainless-steel components similar to that used at the Little Goose Dam; and, (4) increased costs in the amount of $10,735 due to the changed requirement for split as opposed to monolithic pump plates (*id*.).[4]  Derian reduced its total increased cost claim to $67,169 (*id*.).

55.  Derian also calculated a contract credit for the work removed from the contract by the partial termination (compl. at 2-3) and disputed the government's application of liquidated damages to the final contract payment (compl. at 3-4).  Finally, Derian's complaint sought termination settlement costs in the amount of $35,076 (compl. at 2-3).  These costs included $7,881 for its subcontractor, CREM, and $27,195 for its termination settlement costs (*id*.).

DECISION

I.  Standard of Review

The parties have elected a written disposition under Board Rule 11.  Board Rule 11 permits the parties "to waive a hearing and to submit [their] case upon the record." *Reed Int'l, Inc*., ASBCA No. 61451 *et al*., 20-1 BCA ¶ 37,587 at 182,513 (citing *DG21, LLC*, ASBCA No. 57980, 15-1 BCA ¶ 36,016 at 175,909 n.1).  Unlike a motion for summary judgment, which must be adjudicated based on undisputed facts, the Board "may make findings of fact on disputed facts" when resolving an appeal

---

[3] Appellant's complaint did not use numbered paragraphs.  The citations are to the page numbers.

[4] Derian noted that the government in its final decision determined Derian's claim for increased costs resulting from the pump plate modification had partial merit in the amount of $1,860 (compl. at 2).

under Board Rule 11. *U.S. Coating Specialties & Supplies, LLC*, ASBCA No. 58245, 20-1 BCA ¶ 37,702 at 183,031 (citation omitted).

## II. The Deductive Credit

Although the government chose to delete the contract work pursuant to the contract's termination clause and not via a deductive change under the changes clause, the parties have proceeded as if the reduction of work was a change rather than a partial termination for convenience. Derian did not submit a termination settlement proposal for any incurred costs on the terminated work. Rather, the parties sought to agree upon a final contract price by negotiating the increased cost claims and determining the contract price deduction due to the reduced contract work. Subtracting the reduced contract work from the contract price to determine the contract's final price is typically used to calculate the government's downward price adjustment on a fixed-price contract resulting from a deductive change order. *Celesco Indus., Inc.*, ASBCA No. 22251, 79-1 BCA ¶ 13,604 at 66,683. Fortunately, we are not bound by the contracting officer's label of "partial termination" notice and will treat the reduction of work as a deductive change to establish the contract's final price. *Goetz Demolition Co.*, ASBCA No. 39129, 90-3 BCA ¶ 23,241 at 116,618, *recons. denied*, 91-1 BCA ¶ 23,397.

A contract equitable adjustment should safeguard contractors and the government against the increased and decreased costs engendered by modifications adding or deleting contract work. *Nager Elec. Co. v. United States*, 442 F.2d 936, 946 (Ct. Cl. 1971). As such, an equitable adjustment must be closely related to and contingent on the altered position the contractor finds itself in because of the modification. *HCS, Inc.*, ASBCA No. 60533, 16-1 BCA ¶ 36,502 at 177,855. Hence, the government is entitled to a downward adjustment in the contract price to the extent any reduction in the contract work decreases Derian's costs of performing the contract. *Goetz Demolition Co.*, 90-3 BCA ¶ 23,241 at 116,618. That credit is measured by the contractor's net cost savings from the deleted work. *CTA Inc.*, ASBCA No. 47062, 00-2 BCA ¶ 30,947 at 152,762. The government has the burden of proof as to the extent to which the contract requirements were reduced and the savings resulting from those reductions, regardless of whether the reduction is deemed a partial termination for the government's convenience or a deductive change. *Nager Electric Co.*, 442 F.2d at 946; *Celesco Indus., Inc.*, 79-1 BCA ¶ 13,604 at 66,681. Derian is entitled to receive the full contract price unless the government demonstrates it is entitled to a price reduction for the deleted work. *HCS, Inc.,* 16-1 BCA ¶ 36,502 at 177,855; *CTA Inc.*, 00-2 BCA ¶ 30,947 at 152,762.

To determine the correct price reduction due to the deductive change, we must attempt to reconstruct as accurate an estimate as possible the value or cost of the unperformed work. *Goetz Demolition Co.*, 90-3 BCA ¶ 23,241 at 116,618. Using the

originally proposed prices to measure the downward adjustment has often been considered and rejected. *EJB Facilities Servs.*, ASBCA No. 57547, 13-1 BCA ¶ 35,399 at 173,680-81. Deductive changes are usually based on a contractor's current estimate or "would have cost" projection rather than on the original proposal prices. *URS Fed. Support Servs., Inc.*, ASBCA No. 59998, 21-1 BCA ¶ 37,848 at 183,783-84 (Air Force's calculation of the deductive change amount "flawed" because the Air Force did not use URS' actual costs data); *Osborne Constr. Co*, ASBCA No. 55030, 09-1 BCA ¶ 34,083 at 168,513 (bid amount irrelevant to pricing deductive change); *Olympiareinigung, GmbH*, ASBCA No. 53643, 04-1 BCA ¶32,458 at 160,563 (amount allocated in bid for deleted work irrelevant to pricing a deduction); *Fordel Films West*, ASBCA No. 23071, 79-2 BCA ¶13,913 at 68,298 (contractor not bound by costs estimated in proposals in pricing a downward adjustment); *Celesco*, 79-1 BCA ¶13,604 at 66,683 (deduction should be based on the contractor's current estimate or "would have" cost for performing the deleted work); *see also* 11 THE NASH & CIBINIC REPORT ¶ 39, *Equitable Adjustments for Deleted Work: The Severability Exception to the "Would have Cost" Rule* (1997); 12 THE NASH & CIBINIC REPORT ¶15, *Postscript: Equitable Adjustments for Deleted Work* (1998).

The government's estimated cost of $186,985 for the deleted work appears to be the appropriate starting point to determine the value of the reduced work since the government based that estimate on Derian's estimated costs to complete the work and not Derian's proposed price. The government calculated its estimate using Derian's documented and acceptable costs from its proposal and various cost estimating tools, methods, labor rates and indexes (finding 49). Derian, on the other hand, calculated the value of the deleted work based upon its original approved proposed rates (finding 50). As discussed above, it is well established that the Board has frequently rejected using the original proposed prices to measure the downward adjustment in costs resulting from a deductive change. *EJB Facilities Servs.*, 13-1 BCA ¶ 35,399 at 173,680-81. Moreover, Derian provided no support in the record for its proposed prices (finding 50).

While the government's estimated cost for Derian to complete the deleted work appears to be the appropriate starting point, Derian, in its brief, identified numerous errors in the government's calculation. Derian first contends the government's estimate includes costs for non-terminated work (app. br. at 14). Derian points out the government's estimate "included a $17,253 credit to attach Sump Drain to CRES Header (Transition Units 1-6) *for all six units*" (italics in original) (app. br. at 14 citing app. supp. R4, tab 72 at 197). The notice of termination confirms Derian had already completed this work for Units 2 & 4 prior to the termination (finding 35). The government did not respond to this contention in its reply brief. We find the $17,253 credit to attach the sump drain to the CRES Header should be reduced by one-third to $11,502 since Derian had already completed that work on Units 2 & 4.

15

Similarly, Derian points out the government's estimate for the deletion of the installation of parts for the new turbine pit sump pumps is overstated (app. br. at 14). The government's estimate included costs for installing parts on four units (app. supp. R4, tab 72 at 202). Derian contends it had already purchased and installed parts for four of the pumps (app. br. at 14). The partial termination notice indicates the government deleted the pumps and piping installation only on units 1 and 3 (finding 35). The government also did not respond to this contention in its reply brief. We find the government's estimate for the deletion of the installation of parts for the new turbine pit sump pumps should be reduced by 50% to $16,648 since this work was deleted on two, not four units.[5]

In its brief, Derian identifies other alleged mistakes in the government's cost estimate. For instance, Derian claims it installed the "totalizer for the mechanical gear pump" before the termination (app. br. at 14 citing app. supp. R4, tab 72 at 199). The government included this part in its deleted items in the amount of $416 as part of CLIN Item 0001 (R4, tab 8a at 1407). We find this item should also be deleted from the government's cost estimate.

On CLIN Item 0001, OWS Commissioning and Training, the government included an estimated cost of $19,730 (*id*.). This cost included three subitems: (1) "USR Startup Engineer" in the amount of $15,177; (2) "USR Assistance of Commissioning Agent" in the amount of $2,484; and (3) "USR Water Sampling/Testing" in the amount of $2,070 (*id*.). Derian contends it contracted with Mercer International for the startup engineer services in the amount of $7,500 before the termination and paid them on February 12, 2020, at the government's direction (app. br. at 14 citing app. supp. R4, tab 94). The government did not respond to this contention in its reply brief. Since Derian provided actual cost data showing it had already paid for this service, we find the $15,177 cost estimate to complete this work should be deleted from the government's OWS Commissioning and Training cost estimate. The "OWS Commissioning and Training" estimated cost is reduced to $4,554.

Under CLIN Item 0002, "Supply and Install New Turbine Pit Sump Pumps", the government estimate included 112 man-hours at the cost of $13,318 to remove and

_____

[5] Derian's brief indicates it offered to include a credit for the main unit work based on its actual pricing for the incomplete work and not the government's estimated completion cost (app. br. at 14). Hence, Derian includes a calculation of $24,451 for the installation of parts in its price reduction rather than 50% of the government's $33,296 cost estimate. We reject Derian's number because we base this decision on the government's estimated cost to complete the deleted work, which in part is based upon Derian's actual cost experience, not Derian's proposed price.

16

salvage the eight remaining pumps (app. br. at 15 citing app. supp. R4, tab 72 at 201-02). The government estimated a crew size of 7 mechanical and 5 electrical workers performing the work inside the main unit turbines (app. br. at 15 citing app. supp. R4, tab 72 at 204). Derian contends this estimate is "patently unreasonable" (app. br. at 15). Derian indicates it used a four-person mechanical crew and two electrical workers to perform the removal and salvage work on the other four pumps (*id*.). We find Derian's cost estimate based upon its actual cost experience in performing this task on the other four pumps more reasonable than the governments. The government's cost estimate for this service is reduced by $7,513 to Derian's $5,805 estimated cost to complete this work.

On CLIN Item 0002, the government also estimated a credit on five of the six units for removing and salvaging flexible pipe in the amount of $4,162 and the removal of electrical in the amount of $6,563 (app. supp. R4, tab 72 at 202). Derian contends it had already performed this work on two units (four pumps), not one unit (two pumps), so the government estimate is overstated since only eight pumps on four units remained (app. br. at 15). The government does not refute this contention. The government's cost estimate should be reduced by one-fifth for both items resulting in a cost estimate of $3,330 for the removal and salvaging of the flexible pipe and $5,250 for the electrical removal.[6]

In its brief, Derian also points out the government included $23,123 for "Commissioning of Pumps in the Turbine Pits" in its estimate (app. br. at 16 citing app. supp. R4, tab 72 at 203). Derian claims this estimate was overstated by $10,677 (app. br. at 16). Derian provided copies of its canceled signed subcontracts for this work that totaled $12,446 (app. supp. R4, tabs 96, 97).

In its reply brief, the government contends Derian's figure is understated since the contract required a manufacturer's representative to make six separate trips to startup and commission each unit (gov't reply br. at 8). The contract stated, "[E]ach unit must be completely operational, commissioned, and ready to be back on line prior to taking another unit out of service" (finding 3). As a result, we find the government is correct that the manufacturer's representative would have had to make six different trips to commission each unit. Moreover, the government noted Mr. Voit could not act as the startup technician for Derian since he was not a "manufacturer's representative" (gov't reply br. at 8). We find the government's argument persuasive and accept its $23,123 credit for commissioning the pumps as reasonable.

---

[6] In its brief, Derian suggests an estimated cost of $2,489 is reasonable for demolishing two pumps at each of the 4 remaining units (app. br. at 15). Derian's brief, however, is unclear as to how it arrives at this figure, so we do not accept it.

Finally, the government cost estimate assumed a 27% overhead rate and a 5.95% profit on the prime contract (finding 49). On the other hand, Derian calculated its estimate using the contractual agreed rates of 26.66% overhead and a profit ranging from 4.35% to 6.66% (app. br. at 16). We find that we do not need to adjust the government's proposed rates since the difference between the two sets of proposed rates is negligible.

Both the government and Derian included costs for the inventory/turnover of materials resulting from the government's reduction of work on the contract as an offset to the deductive credit price reduction (gov't br. at 23; app. br. at 18). Derian also included costs it labeled as "Termination Costs – Negotiations as of 2/5/21" as an offset to its calculation (app. br. at 18).[7] Both parties, however, discussed the allowability of these costs under the termination for convenience settlement clause (gov't br. at 23-25; app. br. at 18-20). Even though the government labeled its reduction of work as a partial termination for convenience, the parties treated it as a deductive change. Derian's costs incurred in responding to and negotiating the deductive change should therefore be addressed as contract administration costs responding to this change rather than under the partial termination for convenience clause.

Derian first seeks a $20,165 offset for its costs incurred in discussions with the government and responding to various information requests from the government pertaining to establishing the value of the terminated work (app. br. at 18-19). In support of those costs, Derian submitted a document entitled "Derian Termination Negotiation Worksheet" dated February 5, 2021 (app. supp. R4, tab 104 at 624). This document shows Mr. Mark Jensen, Derian's president, incurred 57 hours ($6,993) while Mr. Voit, Derian's project manager, incurred 92 hours ($7,507) during the negotiations establishing the price for the reduced contract work (*id*.). The document also shows Mr. Philip Fielding, identified as CREM's project manager, incurred five hours ($632). The document has a subtotal of $15,132 in incurred labor costs, to which Derian applied overhead ($4,034) and profit ($999) to arrive at the total claimed amount of $20,165.

Derian included supporting monthly timecards from September 2020 through February 2021 for Mr. Jensen and Mr. Voit indicating the number of hours each month they worked on the "Lower Monumental Dam" project (app. supp. R4, tab 104 at 626-37). The government contends these timecards do not specifically describe the type of work performed or any proof of payment (gov't reply br. at 7). While the timecards do not specifically identify that these two individuals worked on the contract price reduction negotiations, Derian claims these individuals' time during this period on this

---

[7] The government did not include any of Derian's claimed "termination negotiation" costs in its cost reduction calculation (gov't reply br. at 7).

contract was exclusively devoted to weekly discussions and providing requested information to the government pursuant to the termination (app. br. at 19). Since Derian completed its performance on the contract in early 2020, we find Derian's assertion credible. Moreover, Derian did not submit its certified claim on this matter until February 25, 2021 (finding 43). These costs do not appear to have been incurred in connection with the prosecution of a CDA claim.

Contract administration costs are "presumptively allowable if they are reasonable and allocable" and not incurred in connection with pursuing a CDA claim. *Bill Strong Enterprises, Inc. v. Shannon*, 49 F.3d 1541, 1549 (Fed. Cir. 1995) *overruled in part on other grounds, Reflectone, Inc. v. Dalton*, 60 F.3d 1572 (Fed. Cir. 1995) (en banc). We find sufficient documentation exists supporting Mr. Jensen's and Mr. Voit's time and determine that the claimed hours and costs are allocable and reasonable.

Derian did not, however, provide similar supporting documentation for Mr. Fielding's time. The only support for Mr. Fielding's time is the hours listed on the spreadsheet. Numbers on a spreadsheet without any additional supporting documentation is insufficient to support the incurred costs. *Vistas Construction of Illinois, Inc.*, ASBCA Nos. 58479, 58480, 58481, 58482, 58483, 58486, 58487, 58488, 16-1 BCA ¶ 36,236 at 176,796-97 (other than numbers written on a spreadsheet, there is no support for the hours alleged). We, therefore, disallow Mr. Fielding's claimed hours.

In summary, we allow $19,323 as an offset to the cost reduction on the contract for Mr. Jensen and Mr. Voit's time negotiating the cost reduction including overhead and profit.[8]

Derian also seeks an offset to the contract price reduction for both its own and its subcontractor CREM's costs for the inventory/turnover of materials resulting from the government's reduction of work on the contract (app. br. at 19-20). Derian seeks an offset in the amount of $7,030 for its own incurred direct labor costs associated with the inventory/turnover of materials (app. br. at 19). Derian supplied supporting documentation for these labor hours (app. supp. R4, tab 103 at 610). Moreover, the government does not challenge these costs. We find Derian's claimed costs in the amount of $7,030 to process the inventory associated with the reduced contract work reasonable.

Derian also claims $7,881 in costs as an offset to the contract price reduction for costs its subcontractor allegedly incurred to determine final contract closeout and document project turnover conditions (app. br. at 19). In support of those costs,

---

[8] $14,500 + (OH @ 26.66% = $3,866) + (profit at 6.6% = $957) = $19,323.

Derian provided a proposal from CREM proposing 55 hours to close out the project (app. supp. R4, tab 102 at 606-09) and a worksheet entitled "CREM Termination Costs Worksheet" (*id*. at 604). The worksheet reflected the price for a "CREM Termination Costs change order" in the amount of $5,914 with the addition of Derian's overhead and profit for a total claimed amount of $7,881 (*id*.).

The government alleges CREM's time records supporting these claimed 55 hours show only 30 of the claimed hours coded as direct labor for the termination project (gov't br. at 24 citing R4, tab 7f at 1355).[9] The remaining 25 hours in CREM's records are apparently labeled "COVID" (*id*.). Derian responds that CREM switched accounting systems during this time period, and their manager arbitrarily applied "COVID" to 20% of all labor from the old system (app. reply br. at 14; R4, tab 7f at 1354). CREM admits it no longer has any time sheets or daily reports from that time (R4, tab 7f at 1352).

Derian bears the burden of providing supporting documentation showing the claimed costs have been incurred and are allocable to the contract. FAR 31.201-2(d), DETERMINING ALLOWABILITY (MAY 2004). We find Derian has not met this burden in supporting all its CREM subcontractor costs to close out the project. *Analytical Assessments Corp*., ASBCA Nos. 52393, 52394, 01-2 BCA ¶ 31,483 at 155,426 (Board found that the evidence was insufficient to support cost allowability). Hence, we disallow the 25 hours labeled as "COVID" and allow the remaining unchallenged 30 hours. This results in a recovery of $4,299 in costs for the CREM subcontract costs (55% of CREM's $7,881 claimed subcontract labor hour costs) as an offset to the contract price reduction for costs CREM incurred to determine final contract close out.

The below table sets out our conclusions regarding the deductive credit amount:

|  | Gov't | Derian | Finding |
|---|---|---|---|
| CLIN ITEM 0001 Supply And Install New Oil Water Separators | 49,112 | 24,045 | 27,769 |
| Install Parts | 416 | 0 | 0 |
| Commissioning and Training | 19,730 | 4,293 | 4,554 |
| Curtain | 11,713 | 9,017 | 11,713 |
| Sump Pump Drain to CRES Header | 17,253 | 10,735 | 11,502 |
| CLIN ITEM 0002 Supply And Install New Turbine Pit Sump Pumps | 81,907 | 57,485 | 66,589 |
| Equipment Nameplate Installation | 828 | 1,085 | 828 |
| Remove Existing Pumps and Piping | 24,043 | 6,637 | 14,385 |

---

[9] Neither party provided CREM's actual labor hour time entries in the record.

| | | | |
|---|---|---|---|
| Remove and Salvage Pumps | 13,318 | 5,805 | 5,805 |
| Remove and Salvage Flexible Pipe | 4,162 | 832 | 3,330 |
| Remove Electrical | 6,563 | 0 | 5,250 |
| Install New Turbine Pit Sump Pumps | 68,024 | 49,763 | 51,376 |
| Install Parts | 33,296 | 24,451 | 16,648 |
| Electrical | 11,605 | 12,866 | 11,605 |
| Commissioning Pumps in Turbine Pits | 23,123 | 12,446 | 23,123 |
| ITEM 0004 Install Headcover VFDS | 55,966 | 55,966 | 55,966 |
| Costs for Inventory/Turnover of Materials | | | |
| Derian's Costs | (7,280) | (7,030) | (7,030) |
| CREM's Costs | (3,709) | (7,881) | (4,299) |
| Derian Negotiation Costs | 0 | (20,165) | (19,323) |
| TOTAL | 175,996 | 102,420 | 119,672 |

We find the government is entitled to a deductive credit on the contract in the amount of $119,672.

III. Derian's Increased Cost Claims

On July 16, 2020, Derian submitted an REA listing 11 actions that allegedly created contract changes and delays resulting in increased costs (finding 43). In its complaint, Derian reduced its claims for increased costs to four (finding 54). The four remaining increased cost claims include: (1) $13,362 for its electrical subcontractor CREM's alleged increased costs due to the work stoppage resulting from the power outage; (2) $15,745 for Derian's own alleged increased labor and vendor costs resulting from the delay due to the power outage and the government's failure to grant a safe clearance; (3) $27,327 due to the alleged changed contract requirement to provide different stainless-steel components similar to that used at the Little Goose Dam; and, (4) $10,735 in additional labor and material costs resulting from the alleged changed requirement to use split pump plates rather than monolithic plates (*id.*). We address each of Derian's remaining increased cost claims in turn.

a. Power Outage and Failure to Grant a Safe Clearance Claims

In its complaint, Derian asserted claims for its subcontractor CREM's and its own alleged increased costs resulting from the power outage and the government's failure to grant a safe clearance (*id.*). In its brief, Derian broke down its claim for these costs between the increased costs resulting from the power outage and the increased costs resulting from the government's alleged failure to grant safe clearance (app. br. at 20).

21

Derian first asserts the government prevented its own and its subcontractor's personnel from accessing the dam and performing any work due to the power outage (*id*.). We previously determined the government issued the stop-work direction due to its concerns with various quality deficiencies and not due to the power outage (finding 18). Any additional costs Derian or its subcontractor incurred at that time resulted from that stop work order and not the power outage. The power outage may have brought Derian's quality deficiencies to the government's attention, but the government issued the stop-work directive due to its concerns with Derian's quality deficiencies.

To prevail on its delay claim, Derian must show the extent of the alleged delay, the causal link between the government's wrongful acts and the delay in its performance, and the alleged harm to the contractor resulting from the delay. *Kinetic Builder's Inc. v. Peters*, 226 F.3d 1307, 1316 (Fed. Cir. 2000). We find the government's decision to suspend Derian's work on July 23, 2019, due to the issues with Derian's quality control program, including deficient pump foundation plates, the failure to hold the required preparatory meetings and working without adequate oversight, until Derian submitted an acceptable revised quality assurance plan was reasonable. *Granite Constr. Co.*, ASBCA No. 62281, 21-1 BCA ¶ 37,756 at 183,281 (If the suspension is reasonable, there is no cost to the government.) Moreover, Derian's project manager acknowledged Derian's quality control program was unacceptable (finding 22).

Furthermore, the government asserts it did not grant Derian safe clearance to begin the electrical work inside the pump units on July 23, 2019, due to Derian's failure to complete the pre work clearance process (gov't br. at 10). The government notes Derian failed to obtain the required AHA report approval before beginning the electrical work inside the pump unit (gov't br. at 11). Derian claims it received that approval when it submitted an AHA dated July 11, 2019, describing the "Activity/Work Task" as "Pump Install (Electrical)" (app. br. at 20).

The contract required Derian to submit AHA reports to the contracting officer for approval before beginning each activity, task, or DFOW (finding 8). Derian's "Quality Control Plan" DFOW list included "Division 26 – Electrical" (finding 7). The record indicates Derian submitted an AHA dated July 11, 2019, describing an "Activity/Work Task" as "Pump Install (Electrical)" that the government accepted with various comments on July 17, 2019 (finding 14). The comments included direction for Derian to "[R]esubmit revised AHA when definable features of work are added" (*id*.). The record does not indicate Derian resubmitted the revised AHA with the DFOW's (*id*.). The government's refusal to give Derian safe clearance to begin the electrical work inside the pump unit until Derian obtained the required government approval for the DFOW, Division 26 – Electrical AHA was reasonable.

22

The government also asserts it did not grant Derian safe clearance to begin the electrical work inside the pump units because Derian failed to hold the contractually required preparatory meeting before beginning that electrical work (gov't br. at 11-12). The contract required Derian to hold preparatory meetings before beginning work on each DFOW (finding 9). Derian did not hold the preparatory meeting for the electrical work until August 12, 2019 (finding 15). The government's decision to withhold Derian's safe clearance to begin the electrical work inside the pump unit until Derian held the required preparatory meeting was also reasonable.

In addition, Derian failed to establish with any reasonable certainty the extent of any delay damages attributable to the government's actions. To establish entitlement to compensable delay damages, Derian must prove "the government was responsible for specific delays; overall project completion was delayed as a result; and any government-caused delays were not concurrent delays within appellant's control." *Env't Chem. Corp.*, ASBCA Nos. 59280, 60760, 22-1 BCA ¶ 38,166 at 185,365 citing *WECC, Inc.*, ASBCA No. 60949, 21-1 BCA ¶ 37,948 at 184,306 (quoting *Versar, Inc.*, ASBCA No. 56857 *et al.*, 12-1 BCA ¶ 35,025 at 172,128). Moreover, Derian must show the government's actions affected activities on the critical path of its contract performance. *Essex Electro Eng'rs, Inc. v. Danzig*, 224 F.3d 1283, 1295 (Fed. Cir. 2000) (contractor must demonstrate the government's acts affected activities on the critical path to recover under a delay claim). Here, Derian failed to establish any delay days were solely attributable to government actions. Derian also failed to show that any of the delay days impacted the contract schedule's critical path. Derian's claims for its own, and its subcontractor CREM's, alleged increased costs resulting from a power outage and the government's failure to grant a safe clearance are denied.

b. Changed Stainless-Steel Contract Requirement

Derian next asserts a claim for increased costs resulting from a constructive change due to the alleged changed contract requirement to provide different stainless-steel components similar to those used at the Little Goose Dam (app. br. at 21). Derian alleges the government's quality assurance representative, Mr. Kuhlmann, directed Derian during the original MU4 installation to make the main unit head cover pump installation look the same as the one installed at the Little Goose Dam (*id.*). Derian claims this change required it to purchase premium materials beyond the contract requirements and completely re-install the MU4 piping system (*id.*).

The government contends Mr. Kuhlmann never directed Derian to perform work outside the contract (gov't br. at 16). In his declaration, Mr. Kuhlmann attested he sent photos of a recently installed oil water separator at the Little Goose Lock & Dam to Derian "as an example of the quality we expected" (R4, tab 2c at 22). Mr. Kuhlmann denies saying, "make it look like the photos, and I'll accept it" (*id*). Mr. Kuhlmann's declaration appears to be supported by the contemporaneous

23

documentation. In an email dated July 31, 2019, Mr. Kuhlmann sent pictures of the Little Goose oil water separator to Derian (finding 20). In that email, Mr. Kuhlmann stated, "[T]his is the quality we will be looking for and Derian needs to strive for" (*id*.). Mr. Kuhlmann did not appear to specifically direct Derian to use premium materials or otherwise direct them on how to accomplish the piping installation.

A contractor is entitled to an equitable adjustment for a constructive change to the contract when it shows "(1) that it performed work beyond the contract's requirements, and (2) that the additional work was ordered, expressly or impliedly, by the government." *BGT Holdings LLC v. United States*, 984 F.3d 1003, 1012 (Fed. Cir. 2020); *Kiewit Infrastructure W. Co. v. United States*, 972 F.3d 1322, 1329 (Fed. Cir. 2020). Moreover, for a contractor to recover for a change, the person acting for the government must possess authority to modify the contract. *Winter v. Cath-dr/Balti Joint Venture*, 497 F.3d 1339, 1344 (Fed. Cir. 2007); *Northrop Grumman Sys. Corp. Space Sys. Div.*, ASBCA No. 54774, 10-2 BCA ¶ 34,517 at 170,238-39.

Here, the government contends Mr. Kuhlman did not direct Derian to provide different stainless-steel requirements (gov't br. at 16). Moreover, the government asserts Mr. Kuhlman had no authority to change the contract requirements even if he had directed the changed work (*id*. at 17). The government identifies several instances in which it informed Derian that only a warranted contracting officer acting within their delegated authority had the authority to change the contract's terms and conditions (s*ee e.g.*, findings 11, 12).

Derian contends it called the ACO seeking clarification of Mr. Kuhlmann's role on the contract and left the ACO a voice message (app. br. at 21 citing R4, tab 5h at 1043). Derian further contends the ACO did not return that call (app. br. at 21.) Derian's assumption that the ACO delegated the contract authority to the QAR by not responding to a voicemail message is unreasonable. A contracting officer's ratification of an unauthorized act requires the contracting officer with the authority to have knowledge of the unauthorized act and then act to adopt the unauthorized action. *Reliable Disposal Co*., ASBCA No. 40100, 91-2 BCA ¶23,895 at 119,717. Even if the ACO knew of Mr. Kuhlmann's alleged direction, which we do not find, there is no evidence the ACO acted to adopt the unauthorized action. *Heartland Energy Partners*, ASBCA No. 62979, 22-1 BCA ¶ 38,200 at 185,519 (rejecting ratification contention since no evidence contracting officer acted to adopt the unauthorized action).

As such, we find Mr. Kuhlmann did not direct Derian to perform additional work on the main unit head cover pump. Moreover, we find Mr. Kuhlmann had no authority to direct Derian to perform any such additional work. Derian's claim for increased costs resulting from the alleged additional work on the main head cover pump is denied.

c. Pump Plate Modifications

Finally, Derian asserts it is entitled to increased costs in the amount of $10,735 for additional labor and material costs resulting from a required change to the pump plates (app. br. at 21). Derian contends that pump units 1-3 original design required monolithic pump plates (*id.*). Derian further asserts that the government did not provide it access to the turbine pit sump area during its pre-bid tour site visit, so it relied upon the contract drawings design to prepare its bid (*id.*). During its initial inspection of the pump units, Derian notified the government split pump plates would be necessary to address various design conflicts with existing electrical outlets, cabling, and piping (finding 13). The government apparently acknowledged a split plate would be easier to install and would be acceptable (*id.*). Derian claims it incurred additional costs in the amount of $10,735 to custom modify the pump plates (app. br. at 21).

The government responded that it was Derian's responsibility under the contract drawings to verify the pump plate dimensions prior to cutting and fabrication (gov't br. at 21). *See Parker's Mech. Contractors., Inc.*, ASBCA No. 32842, 88-1 BCA ¶ 20,472 at 103,542 (Specifications and drawings requiring field verification place responsibility of choosing means and methods on the contractor). Specifically, the government points out the contract drawings indicate, "[C]ontractor shall field verify the dimensions prior to cutting and fabrication of steel plates" (finding 10). The government further asserts Derian failed to verify the dimensions and chose the means and installation method (gov't br. at 21). In its final decision, however, the government found partial merit in Derian's claim and awarded additional labor costs of $1,860 for the adjustment of the plates to deal with the existing electrical outlets and cabling (finding 48).

The government correctly notes the drawings indicate the contractor shall field verify the plate dimensions (finding 10). In this instance, however, the issue is not the size of the plates but whether the plates should be monolithic or split. The contract drawings show monolithic plates (*id.*). The contract required Derian to conform to the drawings (*id.*). It is well established that when the government requires a contractor to follow detailed plans and specifications, it impliedly warrants that the result will be adequate if the contractor follows the specifications. *D.E.W., Inc.*, ASBCA No. 35896, 94-3 BCA ¶ 27,182 at 135,459.

Moreover, the government did not provide Derian access to the turbine pit sump area during the pre-bid site tour, so Derian's reliance upon the contract drawings was reasonable (app. br. at 21). Derian notified the government of the potential problem with the plates following its initial site visit (finding 13). The government accepted the pump plate modification (*id.*). In its final decision, the government also

25

agreed to pay Derian's additional labor costs in adjusting the plates to deal with the existing electrical outlets and cabling (finding 48). We find Derian was required to install the split rather than monolithic pump plates to perform the contract. The defective drawings resulted in a contract change, increasing Derian's costs.

Derian seeks $10,735 for the additional labor and material costs associated with the split pump plates (app. br. at 21). In support of those costs, Derian provided two invoices from Starman Metal Fabricators, LLC, in the amount of $2,163 that appear to be for the increased costs resulting from splitting the pump plates in half and adding splices (app. supp. R4, tab 92 at 554-55). Derian also provided a "Job Cost History Report" showing wages paid from July 21, 2019, through December 13, 2019, for Job 1812, to "Install Pump Cost Type" in the amount of $15,848 (app. supp. R4, tab 92 at 556-60). Derian then subtracted the amount to install the pump labor from its original bid ($9,956) and added overhead (26.66%) and profit (6.6%) to the difference (app. supp. R4, tab 92 at 550).

The government challenged the amount Derian claims for these increased costs (gov't br. at 21-22). The government's claim evaluator, Mr. David Schmode, accepted the two invoices from Starman Metal Fabricators since they detail the additional labor to split the pump plates in half (R4, tab 8a at 1365). Mr. Schmode, however, challenged Derian's labor costs to install the pumps since they contain no explanation of the work performed and show only the amounts paid to various individuals by check number and amount (*id.*).

Derian has the burden of proving its damages with "reasonable certainty." *Precision Pine & Timber v. United States*, 596 F.3d 817, 833 (Fed. Cir. 2010); *Environmental Chemical Corporation*, ASBCA Nos. 59280, 60760, 22-1 BCA ¶ 38,166 at 185,365. We find Derian failed to establish how its labor costs increased because of the split pump plates. The government correctly notes that Derian's labor cost sheet does not explain the work performed (R4, tab 8a at 1365). Moreover, Derian could have incurred the same labor costs installing the monolithic plates without the split. We conclude Derian is entitled to an additional equitable adjustment for the pump plate modification in the amount of $2,883 for the Starman Metal Fabricators invoices fully burdened (overhead at 26.66% and profit at 6.6%) but has failed to prove it is entitled to any additional costs for its own labor.[10]

---

[10] As previously noted, the government already adjusted the contract price in Modification A0004 in the amount of $1,860 for Derian's increased labor costs associated with adjusting the plates to deal with the existing electrical outlets and cabling (finding 46).

IV.  Liquidated Damages

In its final decision, the government asserted a claim for liquidated damages in the amount of $42,720 (finding 52).  The government's liquidated damages assessment was for 32 days at the contractual rate of $1,335 per day based upon a finding of a contract completion date of January 19, 2020, and an actual completion date of February 20, 2020 (*id*.).  Derian contends the government's assessment of liquidated damages is inappropriate since the government waived any contract completion date when it partially terminated the contract and did not establish a new date for the non-terminated work (app. br. at 22).[11]

It is well established "the Government bears the initial burden of proving that the contractor failed to meet the contract completion date and that the period of time for which it assessed liquidated damages is correct."  *Sauer, Inc*., ASBCA No. 62395, 21-1 BCA ¶ 37,845 at 183,753 *citing KEMRON Envtl. Servs. Corp*., ASBCA No. 51536, 00-1 BCA ¶ 30,664 at 151,399.  "Once the government has overcome the initial burden, it is incumbent upon appellant to show either that the government incorrectly assessed the damages under the contract, or that appellant's failure to comply with the terms of the contract was excusable." *Chem-Care Co*., ASBCA No. 53614, 06-2 BCA ¶ 33,427 at 165,726.  Here, the parties dispute the appropriate contract completion date.

The government contends the contract explicitly states a substantial completion date of January 19, 2020 (gov't br. at 27).  The government bases this date upon contract clause FAR 52.211-10(c) that required all on-site installation work for the main unit's headcover pumps be completed by December 20, 2019, with complete system commissioning complete by January 19, 2020 – 30 days after the final main unit 1 installation date (finding 3).  On January 24, 2020, the government notified Derian that the contract completion date of January 19, 2020, for the unterminated work had passed and "not all the work associated with the oil-water separators, as-builts, O&M manuals, etc. are complete" (finding 36).

Derian contends it was not allowed to complete any "Main Unit" installations that formed the basis for the contract completion date since the government terminated that portion of the contract for convenience (app. br. at 22).  Derian correctly notes the

---

[11] Derian also disputes the government's determination of the actual contract completion date since it contends the government took over the terminated portions of the contract and did not complete them until long after the alleged February 20, 2020, substantial completion date (app. br. at 7).  We need not address this contention since we find the government did not establish a new contract completion date for the non-terminated work.

government derived the contract completion date from the original contract schedule wherein the parties contemplated Derian would install and commission each unit during designated, planned outages (app. reply br. at 7). Following the partial termination for convenience, the contract no longer required Derian to install the main unit's headcover pumps for all the units (finding 35). Derian further asserts it had "completed all the required field mechanical and electrical work in anticipation of beginning startup, testing, and commissioning of the OWS system on January 21, 2020" (finding 37).

The original January 19, 2020, contract substantial completion date became inapplicable when the government discovered a design defect and subsequently partially terminated the contract for convenience. Derian satisfactorily installed the new head cover pumps in Unit 4 (finding 24). The government noted, however, the new pumps were unable to keep up with the water inflow when the pumps were turned on (*id.*). The government decided to install VFDs to address this design deficiency and allow the pumps to keep up with the water inflow (finding 25). The government informed Derian to limit its activities on the contract until it developed a new technical solution addressing the leakage problem (finding 26). Derian responded that this development would prevent it from proceeding as scheduled on Unit 6 and was going to impact the approved schedule (*id.*).

The government initially authorized Derian to install the VFDs for the headcover pumps to address the leakage issue (finding 27). The parties signed Modification No. A00002 requiring Derian to install the VFDs at an increased contract price of $131,438.40 (*id.*). The modification further indicated the contract completion date remained unchanged, but the contractor was entitled to additional time related to the modification, and the time impact would be negotiated and settled through a future modification (*id.*). The future modification was never negotiated since the government decided to install the VFDs and remaining pump units independently (findings 30, 35).

In its "Project Change Request Form", the government noted the contractor could not complete the required work partly due to government-caused delays and the differing site condition resulting from the excess leakage (finding 30). The government further noted the units would not be available again to install until after the contract completion date (*id.*). The government determined its best approach would be to modify the current contract to de-scope the remaining work in the turbine pits (*id.*). The government further noted the revised physically complete date would be moved to September 31, 2020 (finding 31). The government issued the partial termination notice to Derian on January 17, 2020 (finding 35).[12] The government did

---

[12] It is interesting to note that the government approved the partial termination on December 19, 2019, but did not issue the partial termination notice until January 17, 2020 (finding 32, 35).

28

not provide Derian with the "final marked-up technical specifications" showing the terminated work until May 12, 2020 (finding 40).

In its final decision, the government used the original contract substantial completion date to assess the liquidated damages (finding 52). That completion date, however, was based on Derian's installation of the main pump units. Following the government's partial termination for convenience, the contract no longer required Derian to perform that work (finding 35). Hence, the contract's substantial completion date was no longer applicable. The government never established a new contract completion date for the non-terminated work. As such, we conclude the original contract completion date was no longer applicable to this contract following the partial termination for convenience, and the government is not entitled to assess liquidated damages based upon that date.

## CONCLUSION

Derian is entitled to be paid the contract price for the non-terminated work. Modification No. A0004 increased the contract price from $2,250,044.71 to $2,263,279.71 (finding 46). We have determined the government is entitled to a deductive credit in the amount of $119,672 resulting from the reduction of work. We have also determined Derian is entitled to an additional equitable adjustment in the contract price of $2,883 for the pump plate modifications. We find the government is not entitled to adjust the contract price for any liquidated damages. Finally, the contract price should be increased by $13,156 for the amount the government, in its final decision, determined Derian was entitled to for its claim for foot valves (finding 48). In summary, we find the final contract price should be $2,159,646.71.

The parties apparently agree Derian has been paid $2,044,870.41 under the contract (app. br. at 3). Derian is entitled to an additional payment of $114,776.30 on the contract plus CDA interest from the date of its certified claim (February 25, 2021).

Dated: August 25, 2023

_____
ARTHUR M. TAYLOR
Administrative Judge
Armed Services Board
of Contract Appeals

(Signatures continued)

29

I concur                                          I concur

RICHARD SHACKLEFORD                               J. REID PROUTY
Administrative Judge                              Administrative Judge
Acting Chairman                                   Vice Chairman
Armed Services Board                              Armed Services Board
of Contract Appeals                               of Contract Appeals


      I certify that the foregoing is a true copy of the Opinion and Decision of the
Armed Services Board of Contract Appeals in ASBCA No. 62957, Appeal of Derian,
Inc., rendered in conformance with the Board's Charter.

      Dated:  August 25, 2023

PAULLA K. GATES-LEWIS
Recorder, Armed Services
Board of Contract Appeals